**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

BIOGEN INC. and BIOGEN MA INC.,

　　　　　　　　*Plaintiffs*,

　　　v.

SANDOZ INC. and POLPHARMA
BIOLOGICS S.A.,

　　　　　　　　*Defendants*.

REDACTED - PUBLIC VERSION
(Filed February 23, 2023)

C.A. No. 22-1190-GBW



<u>**DECLARATION OF SAMANTHA G. WILSON IN SUPPORT OF SANDOZ'S LETTER**</u>
<u>**REGARDING DISCOVERY DISPUTES TO BE HEARD**</u>
<u>**AT THE FEBRUARY 22, 2023 HEARING**</u>

　　　　I, Samantha G. Wilson, declare as follows:

　　　　1.　I am a partner at Young Conaway Stargatt & Taylor, LLP counsel to Sandoz Inc. ("Sandoz") in this matter.

　　　　2.　Attached as Exhibit 1 is a true and correct copy of an excerpt from Biogen's 2013 Form 10-K for the fiscal year ended December 31, 2013.

　　　　3.　Attached as Exhibit 2 is a true and correct copy of Biogen's ███████████ ███████████████████████

　　　　4.　Attached as Exhibit 3 is a true and correct copy of Biogen's ███████████ ███████████████████████

　　　　5.　Attached as Exhibit 4 is a true and correct copy of Biogen's privilege log for redactions to BIOG-TYS0001629527 and BIOG-TYS0002275646 sent from Marina Pullerits to counsel for Sandoz on January 27, 2023.

　　　　6.　Attached as Exhibit 5 is a true and correct copy of ██████████ ██████████████████████████████████

7.   Attached as Exhibit 6 is a true and correct copy of an excerpt from the deposition transcript of Gary Bloomgren, dated January 26, 2023.

8.   Attached as Exhibit 7 is a true and correct copy of an excerpt of Biogen's Objections and Responses to Sandoz's 30(B)(6) Deposition Notice, served on November 29, 2022.

9.   Attached as Exhibit 8 is a true and correct copy of an excerpt of emails sent on December 2, 2022 to December 23, 2022 between counsel for Sandoz and Biogen related to the 30(b)(6) depositions.

10. Attached as Exhibit 9 is a true and correct copy of the deposition transcript of Daniel O'Connell, dated January 6, 2023.

11. Attached as Exhibit 10 is a true and correct copy of Sandoz's Notice of Deposition of Biogen pursuant to Federal Rules of Civil Procedure 30(B)(6), served on November 22, 2022.

12. Attached as Exhibit 11 is a true and correct copy of Biogen's ███████

██████████████████████████████████████████

13. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on February 16, 2023

_Samantha G. Wilson_

_____
Samantha G. Wilson (No. 5816

# EXHIBIT 1

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
# Form 10-K

☑    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   **For the fiscal year ended December 31, 2013**

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 0-19311**

# BIOGEN IDEC INC.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **33-0112644** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**225 Binney Street, Cambridge, Massachusetts 02142**
**(617) 679-2000**
*(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)*

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, $0.0005 par value** | **The Nasdaq Global Select Market** |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐    No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files):   Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑         Accelerated filer ☐         Non-accelerated filer ☐         Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐    No ☑

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant (without admitting that any person whose shares are not included in such calculation is an affiliate) computed by reference to the price at which the common stock was last sold as of the last business day of the registrant's most recently completed second fiscal quarter was $51,089,367,313.

As of January 31, 2014, the registrant had 236,393,930 shares of common stock, $0.0005 par value, outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**
Portions of the definitive proxy statement for our 2014 Annual Meeting of Stockholders are incorporated by reference into Part III of this report.

In September 2013, we entered into a six-year research collaboration with Isis Pharmaceuticals, Inc. (Isis) under which both companies will perform discovery level research and develop and commercialize antisense and other therapeutics for the treatment of neurological disorders. Under the collaboration, Isis will perform research on a set of neurological targets identified within the agreement. Once the research has reached a specific stage of development we will make the determination whether antisense is the preferred approach to develop a therapeutic candidate or whether another modality is preferred. If antisense is selected, Isis will continue development and identify a product candidate. If another modality is used, we will assume the responsibility for identifying a product candidate and developing it. For additional information about this transaction, please read Note 20, *Collaborative and Other Relationships* to our consolidated financial statements included in this report.

In July 2013, we entered into a Platform Agreement with Adimab LLC (Adimab). Pursuant to the agreement, Adimab granted us a non-exclusive license to its proprietary antibody discovery platform that enables our researchers to utilize the Adimab technology for the discovery and optimization of all antibody formats, including bispecific antibodies.

In April 2013, we acquired full ownership of, and strategic, commercial and decision-making rights to, TYSABRI from Elan. Upon the closing of the transaction, our collaboration agreement with Elan was terminated. For additional information about this transaction, please read Note 2, *Acquisitions* to our consolidated financial statements included in this report.

**Patents and Other Proprietary Rights**

Patents are important to developing and protecting exclusive rights in our drugs and drug candidates. We regularly seek patent protection in the U.S. and in selected countries outside the U.S. for inventions originating from our research and development efforts. In addition, we license rights to various patents and patent applications. U.S. patents, as well as most foreign patents, are generally effective for 20 years from the date the earliest application was filed; however, U.S. patents that issue on applications filed before June 8, 1995 may be effective until 17 years from the issue date, if that is later than the 20 year date. In some cases, the patent term may be extended to recapture a portion of the term lost during FDA regulatory review or because of U.S. Patent and Trademark Office (USPTO) delays in prosecuting the application. The duration of foreign patents varies similarly, in accordance with local law.

Regulatory exclusivity, which may consist of regulatory data protection and market protection, also can provide meaningful protection for our products. Regulatory data protection provides to the holder of a drug or biologic marketing authorization, for a set period of time, the exclusive use of the proprietary pre-clinical and clinical data that it created at significant cost and submitted to the applicable regulatory authority to obtain approval of its product. Our products also may qualify for market protection from regulatory authorities, pursuant to which a regulatory authority may not permit for a set period of time, the approval or commercialization of another product containing the same active ingredient(s) as our product. After that set period of time, third parties are then permitted to rely upon our data to obtain approval of their abbreviated applications to market generic drugs and biosimilars. Although the World Trade Organization's agreement on trade-related aspects of intellectual property rights (TRIPS) requires signatory countries to provide regulatory exclusivity to innovative pharmaceutical products, implementation and enforcement varies widely from country to country.

We also rely upon other forms of unpatented confidential information to remain competitive. We protect such information principally through confidentiality agreements with our employees, consultants, outside scientific collaborators, scientists whose research we sponsor and other advisers. In the case of our employees, these agreements also provide, in compliance with relevant law, that inventions and other intellectual property conceived by such employees during their employment shall be our exclusive property.

Our trademarks, including AVONEX, RITUXAN, TECFIDERA and TYSABRI, are important to us and are generally covered by trademark applications or registrations in the USPTO and the patent or trademark offices of other countries. We also use trademarks licensed from third parties, such as the trademark FAMPYRA which we license from Acorda Therapeutics. Trademark protection varies in accordance with local law, and continues in some countries as long as the trademark is used and in other countries as long as the trademark is registered. Trademark registrations generally are for fixed but renewable terms.

A discussion of certain risks and uncertainties that may affect our patent position and proprietary rights is set forth in the "*Risk Factors*" section of this report.

Additional information about the patents and other proprietary rights covering our marketed products and several of our late-stage product candidates is set forth below.

### *AVONEX and PLEGRIDY (peginterferon beta-1a)*

Our U.S. patent no. 7,588,755, granted in September 2009, claims the use of recombinant beta interferon for immunomodulation or treating a viral condition, viral disease, cancers or tumors. This patent, which expires in September 2026, covers the treatment of MS with our product AVONEX, as well as the treatment of MS with our product candidate PLEGRIDY. A discussion of legal proceedings related to this patent is set forth in Note 21, *Litigation* to our consolidated financial statements included in this report.

Additionally, we and another party each own a pending U.S. patent application related to recombinant interferon-beta protein. These applications, which fall outside of the GATT amendments to the U.S. patent statute, are not published by the USPTO and, if they mature into granted patents, may be entitled to a term of seventeen years from the grant date. There is a pending interference proceeding in the USPTO involving these applications. We do not know whether either of these applications will mature into patents with claims relevant to AVONEX or to PLEGRIDY.

Additional protection for PLEGRIDY is provided by patents and patent applications with expiration dates in 2021 in the U.S. and 2019 in the E.U., with the potential for patent term extension. We also expect that PLEGRIDY, if approved, will be granted regulatory exclusivity for 12 years from approval in the U.S. and 10 years from approval in the E.U.

### *TYSABRI*

We have patents and patent applications covering TYSABRI in the U.S. and other countries. These patents and patent applications cover TYSABRI and related manufacturing methods, as well as various methods of treatment using the product. The principal patents covering the product and use of the product to treat MS are U.S. patent nos. 5,840,299 and 6,602,503 and European patent no. (EP) 0804237, which expire between 2015 and 2020. Additional U.S. patents and applications covering methods of treatment using the product and methods of manufacturing the product generally expire between 2014 and 2023. In other countries, additional patents and patent applications covering methods of treatment using the product and methods of manufacturing the product expire between 2014 and 2023, subject to any supplemental protection (i.e., patent term extension) certificates that may be obtained.

### *TECFIDERA*

We have several U.S. patents and patent applications, and a number of corresponding foreign counterparts, related to TECFIDERA.

Our principal U.S. patents and expiration dates, subject to any available patent term extension following product approval, are:

- U.S. patent no. 6,509,376, having claims to formulations of dimethyl fumarate for use in the treatment of autoimmune diseases including MS, expiring in 2019;

- U.S. patent no. 7,320,999, having claims to a method of treating MS using dimethyl fumarate, expiring in 2020;

- U.S. patent no. 7,619,001, having claims to a method of treating MS using dimethyl fumarate, monomethyl fumarate, or a combination thereof, expiring in 2018;

- U.S. patent no. 7,803,840, having claims to a method of treating an autoimmune disease selected from autoimmune polyarthritis and MS using dimethyl fumarate, expiring in 2018;

- U.S. patent no. 8,399,514, covering the dosing regimen of 240 mg of TECFIDERA administered twice a day, expiring in 2028; and

- U.S. patent no. 8,524,773, having claims to a method of treating MS using monomethyl fumarate, expiring in 2018.

Our principal European patents expiration dates, subject to any potential supplemental patent certificates that may be available, are:

- EP 1131065, directed to formulations of dimethyl fumarate and to uses thereof for treating autoimmune diseases, including MS, expiring in 2019; and

- EP 2137537, the counterpart patent to our U.S. patent covering the dosing regimen of 240 mg of TECFIDERA administered twice a day, expiring in 2028.

9

In addition to patent protection, in the U.S. TECFIDERA is entitled to regulatory exclusivity afforded to new chemical entities until 2018. In the E.U., the EMA has determined that dimethyl fumarate in TECFIDERA qualifies as a new active substance (NAS). TECFIDERA is entitled to regulatory exclusivity in the E.U., which is expected to provide 8 years of data protection plus two years of market exclusivity from the date of notification of approval of our marketing application by the EC in February 2014.

### *RITUXAN and Anti-CD20 Antibodies*

We have several U.S. patents and patent applications, and numerous corresponding foreign counterparts, directed to anti-CD20 antibody technology, including RITUXAN. The principal patents with claims to RITUXAN or its uses expire in the U.S. between 2015 and 2018 and expired in the rest of the world in 2013, subject to any available patent term extensions. In addition, we and our collaborator, Genentech, have filed numerous patent applications directed to anti-CD20 antibodies and their uses to treat various diseases. These pending patent applications have the potential of issuing as patents in the U.S. and in the rest of world with claims to anti-CD20 antibody molecules for periods beyond those stated above for RITUXAN. In 2008, a European patent of ours claiming the treatment with anti-CD20 antibodies of certain auto-immune indications, including rheumatoid arthritis, was revoked by the European Patent Office.

Genentech, our collaborator on RITUXAN, has secured an exclusive license to five U.S. patents and counterpart U.S. and foreign patent applications assigned to Xoma Corporation that relate to chimeric antibodies against the CD20 antigen. These patents have expired or will expire between 2007 and 2014. We, along with Genentech, share the cost of any royalties due to Xoma in our co-promotion territory on sales of RITUXAN.

### *FAMPYRA*

We have an exclusive license under two European granted patents, several pending European patent applications and numerous corresponding non-U.S. counterpart applications related to FAMPYRA. European patent EP 0484186B1 claims pharmaceutical formulations containing aminopyridines including fampridine. This patent expired in November 2011 but is subject to pending and granted supplemental protection (i.e., patent term extension) certificates which, if granted, will extend the patent term to 2016 on a country-by-country basis. European patent EP 1732548B1, which claims sustained-release aminopyridine compositions for increasing walking speed in patients with MS, and EP 2377539B1, which claims sustained-release aminopyridine compositions for treating multiple sclerosis both expire in 2025 but are subject to pending and granted supplemental protection certificates which, if granted, will extend one of the patents' term to 2026 on a country-by-country basis. In addition to these patent rights, FAMPYRA is covered by regulatory exclusivity in Europe expected until 2021.

### *ELOCTATE [Antihemophilic Factor, Fc Fusion Protein (Recombinant)] and ALPROLIX [Coagulation Factor IX, Fc fusion protein (Recombinant)]*

We have several U.S. patents and patent applications, and a number of corresponding foreign counterparts, related to ELOCTATE and ALPROLIX, our long-lasting recombinant Factor VIII and Factor IX product candidates and their use, including U.S. patents nos. 7,404,956, 8,329,182, 7,348,004 and 7,862,820. These patents will expire between 2024 and 2025, and some may be entitled to additional patent term pursuant to the patent term adjustment or patent term extension provisions of the U.S. patent laws. Related European patents EP 1624891 and EP 1625208 expire in 2024 and may be entitled to additional patent term in at least some countries. Additionally, pending patent applications, if granted, would provide additional patent protection through 2033.

## Sales, Marketing and Distribution

We focus our sales and marketing efforts on specialist physicians in private practice or at major medical centers. We use customary pharmaceutical company practices to market our products and to educate physicians, such as sales representatives calling on individual physicians, advertisements, professional symposia, direct mail, public relations and other methods. We provide customer service and other related programs for our products, such as disease and product-specific websites, insurance research services and order, delivery and fulfillment services. We have also established programs in the U.S. which provide qualified uninsured or underinsured patients with marketed products at no or reduced charge, based on specific eligibility criteria. Additional information about our sales, marketing and distribution efforts for our marketed products is set forth below.

# EXHIBIT 2

Confidential

BIOG-TYS0001629527

Confidential

BIOG-TYS0001629528



Confidential

BIOG-TYS0001629529

Confidential



Confidential

BIOG-TYS0001629532

Confidential

BIOG-TYS0001629533

Confidential

BIOG-TYS0001629534



Confidential
BIOG-TYS0001629536

Confidential

BIOG-TYS0001629537

Confidential

BIOG-TYS0001629538

Confidential

BIOG-TYS0001629539

# EXHIBIT 3

Confidential

Confidential

BIOG-TYS0002275648

Confidential

Confidential



Confidential

Confidential

Confidential

BIOG-TYS0002275654

biogen idec

Confidential

BIOG-TYS0002275655

Confidential

biogen idec

Confidential

BIOG-TYS0002275657



Confidential

BIOG-TYS0002275659

Confidential

BIOG-TYS0002275660

Confidential

Confidential

BIOG-TYS0002275662

Confidential

Confidential

BIOG-TYS0002275664

Confidential

BIOG-TYS0002275665

# EXHIBIT 4

Biogen Inc. & Biogen MA Inc. v. Sandoz Inc. & Polpharma Biologics S.A., 22-1190-GBW (D. Del.)

| Bates | Document Type | Date | Sender | Recipient | CC | BCC | Document Title | Basis for Redaction(s) | Privilege Type |
|---|---|---|---|---|---|---|---|---|---|
| BIOG-TYS0001629527 | Email Attachment | 5/29/2012 3:36:55 PM (UTC) | Carlo Tanzi | Barry Ticho; Meena Subramanyam | | | Tysabri.5.29.12.pptx | Email attachment containing/reflecting attorney-client communications, legal advice, and attorney work product related to Biogen intellectual property. | Attorney Work Product; Attorney-Client Privilege |
| BIOG-TYS0002275646 | Email Attachment | 5/30/2012 5:11:49 PM (UTC) | Carmen Bozic | Gary Bloomgren; Sandra Richman | | | Tysabri.5.30.12.pptx | Email attachment containing/reflecting attorney-client communications, legal advice, and attorney work product related to Biogen intellectual property. | Attorney Work Product; Attorney-Client Privilege |



**Exhibit**
1098

BIOG-TYS0002422021



Confidential



Confidential



Confidential



Confidential



Confidential



BIOG-TYS0002422027



Confidential



Confidential



Confidential



Confidential



Confidential



Confidential



Confidential

BIOG-TYS0002422034

# EXHIBIT 6

HIGHLY CONFIDENTIAL

```
1                 IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF DELAWARE

3

4        Case No. 22-1190 (GBW)

5

6         BIOGEN, INC., and BIOGEN     )
                                       )
7         MA, INC.,                    )
                                       )
8              Plaintiffs,             )
                                       )
9         vs.                          )
                                       )
10        SANDOZ, INC., and            )
          POLPHARMA BIOLOGICS S.A.,    )
11                                     )
               Defendants.             )
12        _____  )

13

14

15

16         VIDEOTAPED REMOTE DEPOSITION OF GARY BLOOMGREN

17                    HIGHLY CONFIDENTIAL

18                    Scottsdale, Arizona
                      January 26, 2023
19                       9:04 a.m.

20

21

22

          REPORTED BY:
23        Kate E. Roundy, RPR
24        Arizona Certified Reporter
25        Certificate No. 50582
```

                                                    Page 1

HIGHLY CONFIDENTIAL

1    physician and the patient they are working with is not

2    confined to PML?

3        A.   In this case for drug safety and our focus,

4    although we are responsible for ensuring that all adverse

5    events for a drug are captured and enumerated in labeling

6    so patients, prescribers are aware of them, the risk

7    mitigation specific to PML was a paramount focus because

8    of its impact on patients who developed it.

9        Q.   ███████████████████████████████████

██    ██████████████████████████████████████

██    █████████████████████████████████████████████

██    ███████████████████████████

██              ██████████████████████

██         ██   ███████████████████████████████

██    ████████

██         ██   ███████████████████████████████

██    ████████████████████████████████████████████

██    █████████████████████████████████████████████

██    ███████████████████████████

██              █████████████████

██         ██   ████

██         ██   █████████████████████████████

██    ███████████

██              ██████████   █████████████

██              █████████████   ███████████████████

Page 130

HIGHLY CONFIDENTIAL



```
 1      ████████████████████████████████████

        ████████████████████████████████

        ██████████████████████████████████████

        ████████████████████████████████████

        ██████████

 6              It's not something that's surprising.  I think

 7      that's standard in industry, and at least I'm not directly

 8      or was not directly involved in those facets because I --

 9      I had my responsibilities on safety-related

10      pharmaconventional (sic) aspects.

11      BY MS. WALKER:

12          Q.   All right.  Can you scroll down to the next page,

13      please.

14              MS. SPIETH:  I think you said pharmacovigilance

15      aspects.

16              THE WITNESS:  Yes, pharmacovigilance.

17      BY MS. WALKER:

18          ██   ██████████████████████

        ██  ██   ████

        ██  ██   ██████████████████

        ██  ██   ██████████  ██████████████

        ██  ██   ████████████████████

        ██  ██   ███████████████████████  ████████████████

        ██  ███████████████████████████

        ██  ██   ██████████.
```

Page 131

HIGHLY CONFIDENTIAL



18          THE WITNESS:  Tysabri has a REMS and further
19   parts drug safety had to do with the REMS I was involved
20   with.
21   BY MS. WALKER:
22

HIGHLY CONFIDENTIAL

```
 1    ████████████████████████████████████████████
      ██
      █    ██████████████████████████████████
      ██
      █        ████████████████████████████████████████████████
      ██
      █    █████████████
 5    BY MS. WALKER:
 6        Q.    Why would that create a barrier, in your opinion?
 7            MS. SPIETH:  Objection.  He's not an expert, so
 8    he's not going to offer opinion testimony today.
 9    BY MS. WALKER:
10        Q.    You can answer.
11        A.    I'm not an REMS expert.  I'm a safety expert.
12        Q.    But you know the requirements of a REMS program?
13        A.    I know facets of the REMS requirements as it
14    relates to drug safety.  I wouldn't claim to be an REMS
15    expert on all aspects.
16            MS. SPIETH:  We have now been going an hour and
17    15, Quinn.  Let's take a break.  Okay?
18            MS. WALKER:  Let me -- let me finish.  I want to
19    finish up on this section, and then we will take a break.
20            MS. SPIETH:  How much longer do you have?  It's
21    past the time.  How much longer do you have?
22            MS. WALKER:  We will go until I'm finished.
23            MS. SPIETH:  I'm sorry?  I'm sorry?
24            MS. WALKER:  Until the -- 12:40.
25            MS. SPIETH:  Okay.
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL

```
 1   BY MS. WALKER:
 2       Q.   So with the Tysabri REMS, what would cause
 3   problems, you -- you --  Scratch that.
 4            Here we're talking about Tysabri itself; right?
 5            MS. SPIETH:  Objection.
 6            THE WITNESS:  Can you ask your question
 7   differently?
 8   BY MS. WALKER:
 9       Q.   ██████████████████████████████████████
     ██   ██ ██████████████████████████████████
     ██ ████████████████████████████████████████
     ██   ██ ████████████████████████████████████████
     ██ ██████████████████████████████████████
     ██      ████████████ ████████████
15            THE WITNESS:  I'm not an expert on development
16   programs for competitors with or without REMS.  So I'm not
17   the appropriate person to answer that question.
18   BY MS. WALKER:
19       Q.   Were you familiar with the rest of this
20   manufacturing process or need to conduct a clinical trial?
21            MS. SPIETH:  Objection.
22            THE WITNESS:  I'm not a manufacturing expert, so,
23   again, you'll have to speak to somebody who really is in
24   that area.
25            And I was involved in clinical trials, but I
```

Page 134

HIGHLY CONFIDENTIAL

```
 1    can't comment as it relates to, you know, how easy or hard

 2    that would be for a biosimilar in the same place to obtain

 3    entry.

 4    BY MS. WALKER:

 5         Q.    ████████████████████████████████████████████

           ████  ████  ██████████████████████████████████████

 7         Q.    Okay.

 8              MS. WALKER:  I think we can take a break now.

 9              THE WITNESS:  Thank you.

10              THE VIDEOGRAPHER:  Okay.  We are going to be

11    going off the record.  The time is now 12:38.

12              (A recess was taken from 12:38 p.m. until

13    1:22 p.m.)

14              THE VIDEOGRAPHER:  We are back on the record.

15    The time is now 1:22.

16    BY MS. WALKER:

17         Q.    Welcome back, Dr. Bloomgren.

18         A.    Thank you.

19         Q.    Just before we get started, I want to ask, have

20    you had any conversations with Counsel about the substance

21    of your testimony today?

22         A.    No.

23         Q.    Great.

24              MS. WALKER:  Okay.  I think we are going to start

25    with the tab 40, Chelsea, which we will mark as
```

Page 135

HIGHLY CONFIDENTIAL

```
 1    Exhibit 1099.

 2          (Exhibit 1099 was marked for identification.)

 3    BY MS. WALKER:

 4       Q.   And I believe that is up.

 5       A.   I pulled it up.

 6       Q.   Let me know when you have a chance to look at it

 7    and review.

 8       A.   Yeah.  Give me a couple minutes here.

 9            Okay.

10       Q.   Do you recognize this e-mail?

11       A.   ████████████████████████████████████████████

██  ██████████████████████

██      ██  █████████████████████████████████

██      ██  ███████

██      ██  █████

██      ██  █████████████████████████████

██  ██████████████████████████████████████

██  ██████████████████████████████████████

██  ██████████████

██      ██  █████████████████████████████████

██      ██  ██████████████████  ████████████████████

██  █████████████████████  ████████████████████

██  █████████████████

██      ██  ████████████████████████████

██  ████████████████████████████████████████
```

                                                    Page 136

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BIOGEN INC. and BIOGEN MA INC., ) | |
| ) | |
| Plaintiffs, ) | **CONFIDENTIAL** |
| ) | |
| v. ) | C.A. No. 22-1190-GBW |
| ) | |
| SANDOZ INC. and POLPHARMA ) | |
| BIOLOGICS S.A., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO SANDOZ INC.'S
NOTICE OF DEPOSITION OF BIOGEN INC. AND BIOGEN MA INC. PURSUANT TO
FED. R. CIV. P. 30(B)(6)**

Pursuant to the parties' Joint Stipulation and Scheduling Order for Expedited Injunction

Proceedings (D.I. 26), Federal Rules of Civil Procedure 26 and 30, and the Local Rules of this

Court, Plaintiffs Biogen Inc. and Biogen MA Inc. (collectively, "Biogen") provide the following

responses and objections to Defendant Sandoz Inc.'s ("Sandoz") Notice of Deposition of Biogen

Pursuant to Fed. R. Civ. P. 30(b)(6) (the "Deposition Notice"), including the topics listed in

Attachment A to the Deposition Notice (the "deposition topics").

**GENERAL OBJECTIONS**

1.      Biogen objects to the deposition topics to the extent that they seek to impose upon

Biogen any obligations different from, or in addition to, the obligations imposed by the Federal

Rules of Civil Procedure, the Local Rules of this Court, or any Orders of this Court.

2.      Biogen objects to Definition No. 1 to the extent that Sandoz seeks to impose an

obligation on Biogen to produce documents and information that are not within Biogen's

possession, custody, or control.  Biogen further objects that, pursuant to Definition Nos. 1 and 2,

Sandoz defines two corporate entities in different manners, with Biogen defined more broadly than Sandoz.

3.      Biogen objects to Definition No. 10 on the grounds that it is over-inclusive. Pursuant to the Joint Stipulation and Scheduling Order, on November 18, 2022, Biogen served on Sandoz a Notice of Initial Selection of Patent Claims and Preliminary Infringement Contentions for Expedited Preliminary Injunction Proceedings (the "Patent Selection Notice").  Per the Patent Selection Notice, Biogen has initially elected U.S. Patent No. 9,096,879, U.S. Patent No. 10,844,416, U.S. Patent No. 9,316,641, U.S. Patent No. 10,119,976, and U.S. Patent No. 11,280,794 for purposes of discovery for the preliminary injunction proceedings.  These are the patents identified in Definition No. 11 ("PI Patents").  To the extent that Sandoz seeks full discovery on Patents-in-Suit other than the PI Patents during this early period of expedited discovery leading up to the preliminary injunction motion, the deposition topics are overbroad, unduly burdensome, premature, and seek irrelevant information.

4.      Biogen objects to the deposition topics to the extent that they seek information that is not needed for, or is beyond the scope of, the preliminary injunction proceedings.

5.      Biogen objects to the deposition topics to the extent that they are unlimited in temporal and geographical scope.  Such deposition topics are overbroad, unduly burdensome, not proportional to the needs of the case, not reasonably calculated to lead to the discovery of admissible evidence, and irrelevant.  More specifically, such deposition topics are not tailored to identify information needed for the preliminary injunction proceedings.

6.      Biogen objects to the deposition topics to the extent that they are cumulative and/or duplicative.

7.     Biogen objects to the deposition topics and definitions to the extent that they are vague, ambiguous, undefined, overly broad, or unduly burdensome, including because their scope encompasses a quantity of material that would make preparing a witness impracticable.  Biogen further objects to the deposition topics to the extent that they fail to "describe with reasonable particularity the matters for examination," as required under Federal Rule of Civil Procedure 30(b)(6).  Biogen will make reasonable interpretations of the meaning of the deposition topics and definitions, and will respond according to such interpretations.

8.     Biogen objects to the deposition topics to the extent that they call for testimony regarding legal conclusions or determinations.

9.     Biogen objects to the deposition topics to the extent that they seek Biogen's contentions or the facts relating to a particular contention as contrary to well-established law in this district.  *See, e.g., Chalumeau Power Sys. LLC v. Alcatel-Lucent USA, Inc.*, No. 11-1175-RGA, Tr. at 27-28 (D. Del. Oct. 4, 2013) ("contention depositions are not fair to whomever's being asked to formulate these things"); *Reliant Pharms., Inc. v. Par Pharm., Inc.*, No. 06-774-JJF, Tr. at 20-21 (D. Del. Mar. 7, 2008) ("in this district there is a preference that contention discovery be conducted by interrogatory even when factual information is sought"); *Axiohm IPS, Inc. v. Epson Am., Inc.*, No. 00-420-SLR, Tr. at 4 (D. Del. Mar. 28, 2001) ("[W]e don't do contention depositions in this district"); *Tiegel Mfg. Co. v. Globe-Union, Inc.*, No. 84-483, Tr. at 14 (D. Del. Oct. 5, 1984) ("It has been the consistent position of this Court that a lay person shouldn't be required to formulate a party's contention in response to deposition questioning and that not even a lawyer should be required to formulate trial strategy and contentions in immediate response to questions on deposition.").

10.    Biogen objects to the deposition topics to the extent that they call for testimony regarding or requiring expert opinion.

11.    Biogen objects to the deposition topics to the extent that they purport to seek information that is not within Biogen's possession, custody, or control, that cannot be located by a reasonable search, or that is equally available to Sandoz, including from public sources.

12.    Biogen objects to the deposition topics to the extent that they seek information regarding Biogen's trade secrets or other proprietary or confidential technical or business information that is not relevant to the parties' claims and defenses in the preliminary injunction proceedings.   Inadvertent disclosure of any such information shall not act as a waiver of any applicable protections or obligations.

13.    Biogen objects to providing deposition testimony regarding any confidential information prior to the entry of a sufficient protective order in this matter.   As of the service of these written objections and responses, the parties are negotiating a set of terms, but a final protective order has not yet been agreed upon or entered by the Court.

14.    Biogen objects to the deposition topics to the extent that they seek information that is protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection, or require the disclosure of information subject to pre-existing confidentiality agreements or protective orders in other cases.   Inadvertent disclosure of any such information shall not act as a waiver of any applicable protections or obligations.

15.    Biogen objects to the deposition topics as overly broad and unduly burdensome to the extent that they call for Biogen to prepare to testify regarding documents, things, and/or information that does not otherwise exist.   This includes, but is not limited to, documents or

information that may have been misplaced or lost, could not be located after a reasonably diligent search, or is otherwise inaccessible to Biogen.

16.     Biogen objects to the deposition topics to the extent that they seek discovery of information that is available through other means of discovery (including document requests or interrogatories) that are more convenient, less burdensome, or less costly than a deposition.

17.     Nothing in these objections and responses shall be construed as waiving rights or objections that might otherwise be available to Biogen, nor shall Biogen's designation of a deponent with respect to any of the deposition topics be deemed an admission of relevancy, materiality, or admissibility in evidence of the deposition topics or Biogen's responses thereto.

18.     Discovery in this litigation is ongoing.  Biogen reserves its right to supplement or otherwise modify its responses to Sandoz's deposition topics as it deems necessary and appropriate.

## **SPECIFIC OBJECTIONS**

Subject to and without waiving its General Objections, each of which is incorporated into every one of the individual responses below, Biogen responds and objects to Sandoz's individual deposition topics as follows:

## **TOPIC NO. 1:**

Licenses, contracts, and agreements concerning any of the Patents-in-Suit, and the negotiations leading to the formation of those licenses, contracts, and agreements, including Biogen's contractual and license relationship with Quest Diagnostics, Diasorin Molecular, and/or Focus Diagnostics with respect to the performance of the Stratify assay and Biogen's contractual and license relationship with laboratories that conduct or have conducted JCV testing, such as licenses, contracts, agreements, and covenants not to sue regarding the use of Stratify.

## **RESPONSE TO TOPIC NO. 1:**

Biogen objects to this topic as overbroad, unduly burdensome, not relevant, exceeding the scope of the preliminary injunction proceedings, not reasonably calculated to lead to the discovery

of admissible evidence, and not proportional to the needs of the case, particularly because it seeks broad categories of information with no geographical or temporal limits, or other reasonable limits on scope.  Biogen also objects to this topic as premature to the extent that it seeks information concerning Patents-in-Suit other than the PI Patents.  Biogen further objects to this topic to the extent that it calls for information that is protected from disclosure by the work product doctrine, the attorney-client privilege, or any other doctrine or privilege.  Biogen also objects to this topic to the extent that it is duplicative of information available through other means of discovery (including document productions and interrogatory responses) that are more convenient, less burdensome, or less costly than a deposition.  Biogen further states that its licenses, contracts, and agreements concerning the PI Patents speak for themselves and have been produced, and for this reason Biogen will not prepare a deponent to recite or interpret the language of such documents, or to testify to the negotiations leading to the formation of such documents.

Subject to the foregoing General and Specific Objections, Biogen will designate one or more witnesses to testify regarding relevant, non-privileged information responsive to this topic, to the extent that such information exists in the possession, custody, or control of Biogen.

**TOPIC NO. 2:**

The rates and terms on which Biogen has licensed out or licensed in any manufacturing technologies for any biological product, any medical diagnostic patents, or any method of treatment patents involving a medical diagnostic.

**RESPONSE TO TOPIC NO. 2:**

Biogen objects to this topic as overbroad, unduly burdensome, not relevant, exceeding the scope of the preliminary injunction proceedings, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly because it seeks broad categories of information with no geographical or temporal limits, or other reasonable limits

legal conclusions or determinations.  Biogen also objects to this topic to the extent that it seeks Biogen's contentions concerning claim construction, which is a matter for the Court to decide. Biogen will not provide its contentions through deposition.  Biogen further objects to this topic to the extent that it is duplicative of Topic No. 13, as well as information available through other means of discovery (including document productions and interrogatory responses) that are more convenient, less burdensome, or less costly than a deposition.

Biogen will not designate a witness to testify regarding this topic.

**TOPIC NO. 15:**

Pricing, costs, gross revenue, net revenue, profits, and market share (compared to other competing products) associated with Tysabri from 2004 to present.

**RESPONSE TO TOPIC NO. 15:**

Biogen objects to this topic as overbroad, unduly burdensome, not relevant, exceeding the scope of the preliminary injunction proceedings, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, in particular because it seeks information for "2004 to present," is unlimited in geographical scope, and lacks other reasonable limits on scope, yet Tysabri has been on the market for almost 20 years and is sold in multiple countries.  Accordingly, this topic as written encompasses a quantity of material that would make preparing a witness impracticable.  Biogen further objects to this topic to the extent that it is duplicative of information available through other means of discovery (including document productions and interrogatory responses) that are more convenient, less burdensome, or less costly than a deposition.  Biogen also objects to this topic to the extent that it seeks information not in the possession, custody, or control of Biogen.  Biogen also objects to this topic to the extent that it seeks financial information in a manner other than that in which it is ordinarily kept.

Subject to the foregoing General and Specific Objections, Biogen will designate one or more witnesses to testify regarding relevant, non-privileged information responsive to this topic, to the extent that such information exists in the possession, custody, or control of Biogen.

**TOPIC NO. 16:**

Sales projections, forecasts, market share projections, pricing forecasts, and other economic studies relating to Tysabri, any biosimilar natalizumab product, any biosimilar entry to the natalizumab market, or natalizumab, including any valuation or licenses of the PI Patents, such as studies, analyses, reports or other communications concerning the value, estimated value or projected value of the PI Patents and any internal financial or market modeling that identifies when a biosimilar natalizumab product will enter the market.

**RESPONSE TO TOPIC NO. 16:**

Biogen objects to this topic as overbroad, unduly burdensome, not relevant, exceeding the scope of the preliminary injunction proceedings, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly because it seeks broad categories of information with no geographical or temporal limits, or other reasonable limits on scope, and Tysabri has been on the market for almost 20 years and is sold in multiple countries. Biogen also objects to this topic on the grounds that the terms "[s]ales projections, forecasts, market share projections, pricing forecasts, and other economic studies" are vague, ambiguous, and undefined. Biogen also objects to this topic to the extent that it calls for information that is protected from disclosure by the work product doctrine, the attorney-client privilege, or any other doctrine or privilege. Biogen further objects to this topic to the extent that it seeks information relating to draft materials. Biogen also objects to this topic to the extent that it is duplicative of information available through other means of discovery (including document productions and interrogatory responses) that are more convenient, less burdensome, or less costly than a deposition. Biogen further objects to this topic to the extent that it seeks information not in the possession, custody, or control of Biogen.

Subject to the foregoing General and Specific Objections, Biogen will designate one or more witnesses to testify regarding relevant, non-privileged information responsive to this topic, to the extent that such information exists in the possession, custody, or control of Biogen.

**TOPIC NO. 17:**

Whether and why Biogen believes it will suffer irreparable harm, including how the alleged infringement of any patent is causally connected to any irreparable harm that Biogen believes will occur if Sandoz is permitted to sell its biosimilar natalizumab product.

**RESPONSE TO TOPIC NO. 17:**

Biogen objects to this topic as overbroad, unduly burdensome, not relevant, exceeding the scope of the preliminary injunction proceedings, not reasonably calculated to lead to the discovery of admissible evidence, premature, and not proportional to the needs of the case, particularly to the extent that it seeks information unrelated to the PI Patents.  Biogen also objects to this topic to the extent that it calls for legal conclusions or determinations, particularly to the extent that it seeks contentions as to how any harm is causally connected to the infringement of any patent.  Biogen further objects to this topic to the extent that it seeks expert testimony or opinion, as any such request would be premature.

Subject to the foregoing General and Specific Objections, Biogen will designate one or more witnesses to testify regarding relevant, non-privileged information concerning the harm to Biogen, to the extent that such information exists in the possession, custody, or control of Biogen.

**TOPIC NO. 18:**

Any price erosion, loss of customers, loss of market share, and/or other harm allegedly caused by any alleged infringement of the PI Patents.

**RESPONSE TO TOPIC NO. 18:**

Biogen objects to this topic as overbroad, unduly burdensome, not relevant, exceeding the scope of the preliminary injunction proceedings, not reasonably calculated to lead to the discovery

of admissible evidence, and not proportional to the needs of the case, particularly because it seeks broad categories of information with no geographical or temporal limits, or other reasonable limits on scope, and is not limited to alleged infringement by Sandoz.  Biogen also objects to this topic as vague and ambiguous because it refers to harm allegedly caused by prior infringement, without referencing the possibility of harm caused by future infringement.  Biogen further objects to this topic to the extent that it calls for legal conclusions or determinations, particularly to the extent that it seeks contentions as to how any harm is causally connected to the infringement of any patent.  Biogen also objects to this topic to the extent that it seeks expert testimony or opinion, as any such request would be premature.  Biogen further objects to this topic to the extent that it is duplicative of Topic No. 17, as well as information available through other means of discovery (including document productions and interrogatory responses) that are more convenient, less burdensome, or less costly than a deposition.  Biogen also objects to this topic to the extent that it seeks information not in the possession, custody, or control of Biogen.

Subject to the foregoing General and Specific Objections, Biogen will designate one or more witnesses to testify regarding relevant, non-privileged information concerning the harm to Biogen, to the extent that such information exists in the possession, custody, or control of Biogen.

**TOPIC NO. 19:**

Biogen's collaboration with Elan relating to the development of natalizumab, including any due diligence, market analyses or forecasts, and Biogen's subsequent purchase of Elan's interest in Tysabri, including the purchase price, due diligence, and market analyses or forecasts related to the purchase.

**RESPONSE TO TOPIC NO. 19:**

Biogen objects to this topic as overbroad, unduly burdensome, not relevant, exceeding the scope of the preliminary injunction proceedings, not reasonably calculated to lead to the discovery of admissible evidence, premature, and not proportional to the needs of the case, particularly

because it seeks broad categories of information with no geographical or temporal limits, or other reasonable limits on scope.  Biogen also objects to this topic to the extent that it calls for information that is protected from disclosure by the work product doctrine, the attorney-client privilege, or any other doctrine or privilege.  Biogen further objects to this topic on the grounds that the terms "due diligence" and "market analyses or forecasts" are vague, ambiguous, and undefined, and such information would nevertheless be overbroad and irrelevant.   Biogen also objects to this topic to the extent that it is duplicative of information available through other means of discovery (including document productions and interrogatory responses) that are more convenient, less burdensome, or less costly than a deposition.

Subject to the foregoing General and Specific Objections, Biogen will designate one or more witnesses to testify regarding the Elan partnership, to the extent that such information exists in the possession, custody, or control of Biogen.

**TOPIC NO. 20:**

The conception and reduction to practice of the inventions described and claimed in the PI Patents, including the identity and content of any documents that reflect either conception or reduction to practice for the asserted claims.

**RESPONSE TO TOPIC NO. 20:**

Biogen objects to this topic as overbroad, unduly burdensome, not relevant, exceeding the scope of the preliminary injunction proceedings, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly to the extent that it seeks the identity and content of "any" documents that reflect either conception or reduction to practice for the asserted claims.  Biogen also objects to this topic to the extent that it seeks Biogen's validity contentions or other legal conclusions.  Biogen further objects to this topic to the extent that it is duplicative of information available through other means of discovery (including

particularly to the extent that it seeks information not in the possession, custody, or control of Biogen.  Biogen further objects to this topic as vague and overbroad to the extent that it seeks the "facts and circumstances known to Biogen."

Subject to the foregoing General and Specific Objections, Biogen will designate one or more witnesses to testify regarding relevant, non-privileged information responsive to this topic, to the extent that such information exists in the possession, custody, or control of Biogen.

## TOPIC NO. 23:

The facts and circumstances surrounding Biogen's pricing, costs, gross revenue, net revenue, profits, and billing or invoicing associated with the Stratify test.

## RESPONSE TO TOPIC NO. 23:

Biogen objects to this topic as overbroad, unduly burdensome, not relevant, exceeding the scope of the preliminary injunction proceedings, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly because it seeks information regarding a broad set of "facts and circumstances," with no geographical or temporal limits, or other reasonable limits on scope.  Biogen further objects to this topic to the extent that it is duplicative of information available through other means of discovery (including document productions and interrogatory responses) that are more convenient, less burdensome, or less costly than a deposition.

Subject to the foregoing General and Specific Objections, Biogen will designate one or more witnesses to testify regarding relevant, non-privileged information responsive to this topic, to the extent that such information exists in the possession, custody, or control of Biogen.  The testimony will be limited geographically to the United States, and temporally to the past five years.

**TOPIC NO. 24:**

The facts and circumstances relating to the use of Stratify by people that have not received and do not receive treatment with natalizumab.

**RESPONSE TO TOPIC NO. 24:**

Biogen objects to this topic as overbroad, unduly burdensome, not relevant, exceeding the scope of the preliminary injunction proceedings, not reasonably calculated to lead to the discovery of admissible evidence, calling for speculation, and not proportional to the needs of the case, particularly because it seeks broad categories of information with no geographical or temporal limits, or other reasonable limits on scope. Biogen also objects to this topic to the extent that it seeks information not in the possession, custody, or control of Biogen.

Subject to the foregoing General and Specific Objections, Biogen will designate one or more witnesses to testify regarding relevant, non-privileged information responsive to this topic, to the extent that such information exists in the possession, custody, or control of Biogen.

**TOPIC NO. 25:**

Current and former labels and package inserts for Tysabri, including all changes between each version of the labels and package inserts.

**RESPONSE TO TOPIC NO. 25:**

Biogen states that the current and former labels and package inserts for Tysabri speak for themselves, and for this reason Biogen will not prepare a deponent to recite or interpret the language of such documents. Biogen further objects to this topic as overbroad in seeking testimony about all former labels and "all changes" thereto, including versions that have never actually been made available to physicians, patients, or health care providers. Biogen also objects to this topic to the extent that it is duplicative of information available through other means of discovery

(including document productions and interrogatory responses) that are more convenient, less burdensome, or less costly than a deposition.

Subject to the foregoing General and Specific Objections, Biogen will designate one or more witnesses to testify regarding relevant, non-privileged information responsive to this topic, to the extent that such information exists in the possession, custody, or control of Biogen.

## TOPIC NO. 26:

Communications with the FDA or NIH concerning JCV testing, PML, Stratify, and the REMS for natalizumab.

## RESPONSE TO TOPIC NO. 26:

Biogen objects to this topic as overbroad, unduly burdensome, not relevant, exceeding the scope of the preliminary injunction proceedings, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, particularly because it seeks broad categories of information with no geographical or temporal limits, or other reasonable limits on scope. Biogen also objects to this topic because communications with the NIH are not relevant to or necessary for the preliminary injunction. Biogen further objects to this topic to the extent that it is duplicative of information available through other means of discovery (including document productions and interrogatory responses) that are more convenient, less burdensome, or less costly than a deposition. In particular, written communications with the FDA or NIH speak for themselves.

Subject to the foregoing General and Specific Objections, Biogen will designate one or more witnesses to testify regarding relevant, non-privileged communications with the FDA regarding information responsive to this topic, to the extent that such information exists in the possession, custody, or control of Biogen.

objects to this topic to the extent that it seeks information not in the possession, custody, or control

of Biogen.  Biogen further objects to this topic to the extent that it calls for information that is

protected from disclosure by the work product doctrine, the attorney-client privilege, or any other

doctrine or privilege.

      Biogen will not designate a witness to testify regarding this topic.

                MORRIS, NICHOLS, ARSHT & TUNNELL LLP

 

OF COUNSEL:

Eric J. Marandett
Anita M.C. Spieth
Greta A. Fails
Jennie D. Wilusz
Max A. Jacobs
CHOATE HALL & STEWART LLP
Two International Place
Boston, MA  02110
(617) 248-5000

November 29, 2022

                */s/ Derek J. Fahnestock*
                Jack Blumenfeld (#1014)
                Karen Jacobs (#2881)
                Derek J. Fahnestock (#4705)
                1201 North Market Street
                P.O. Box 1347
                Wilmington, DE 19899-1347
                (302) 658-9200
                jblumenfeld@morrisnichols.com
                kjacobs@morrisnichols.com
                dfahnestock@morrisnichols.com

                *Attorneys for Plaintiffs*
                *Biogen Inc. and Biogen MA Inc.*

# EXHIBIT 8

| | |
|---|---|
| **From:** | Pullerits, Marina <mpullerits@choate.com> |
| **Sent:** | Friday, December 23, 2022 1:56 PM |
| **To:** | Dolphin, Rachel S.; Olson, Erik J. (Palo Alto); dfahnestock@morrisnichols.com; kjacobs@morrisnichols.com |
| **Cc:** | MoFo-Sandoz-Natalizumab; Gaza, Anne Shea; Wilson, Samantha; Whitehead, Abigail G.; Chivvis, Matthew Alan; Biogen Tysabri Litigation |
| **Subject:** | RE: [EXT] RE: Biogen v. Sandoz litigation - 30(b)(6) depositions |

Rachel,

Following up on the below, Dr. Meena Subramanyam will cover 30(b)(6) Topic 20 (with regard to the '641, '976, and '794 patents).  Dr. Subramanyam (and not Dan O'Connell, as previously stated) will also cover Topic 21.  These topics can be addressed during Dr. Subramanyam's scheduled deposition on January 4.

With respect to Topic 2, Biogen's witness will be reasonably prepared to testify regarding the rates and terms on which Biogen has out-licensed the Patents-in-Suit.  Biogen's witness will also be reasonably prepared to testify regarding the rates and terms on which Biogen has in-licensed technologies used for the Tysabri product, if any.

With respect to Topic 23,  Biogen confirms that it is not necessarily limiting the topic to a five-year cutoff.  However, Biogen maintains its objections to Topic 23, including that the request is so broad that preparing a witness on the full scope is impracticable.  Subject to Biogen's objections, Biogen's witness will be reasonably prepared to testify regarding this topic.  Biogen's witness will not be prepared with a memory of specific numbers.

Best,
Marina

**From:** Pullerits, Marina <mpullerits@choate.com>
**Sent:** Wednesday, December 21, 2022 8:25 PM
**To:** Dolphin, Rachel S. <RDolphin@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; dfahnestock@morrisnichols.com; kjacobs@morrisnichols.com
**Cc:** MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>; Whitehead, Abigail G. <AWhitehead@ycst.com>; Chivvis, Matthew Alan <MChivvis@mofo.com>; Biogen Tysabri Litigation <biogentysabri@choate.com>
**Subject:** RE: [EXT] RE: Biogen v. Sandoz litigation - 30(b)(6) depositions

Rachel,

Thank you.  We agree that the Boston depositions can take place at MoFo's Boston office (though Choate's office is also an option).  We do not agree that Dan O'Connell's deposition can extend beyond a single seven-hour day.

Best,
Marina

**From:** Dolphin, Rachel S. <RDolphin@mofo.com>
**Sent:** Wednesday, December 21, 2022 5:51 PM
**To:** Pullerits, Marina <mpullerits@choate.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; dfahnestock@morrisnichols.com; kjacobs@morrisnichols.com
**Cc:** MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson,

Samantha <SWilson@ycst.com>; Whitehead, Abigail G. <AWhitehead@ycst.com>; Chivvis, Matthew Alan <MChivvis@mofo.com>; Biogen Tysabri Litigation <biogentysabri@choate.com>
**Subject:** RE: [EXT] RE: Biogen v. Sandoz litigation - 30(b)(6) depositions

**External Email**

Hi Marina,
We accept the dates and locations provided so far. We assume the Boston ones will be in the MoFo Boston office at 200 Clarendon St Floor 20, Boston, MA. Given the number of topics Mr. O'Connell is designated on, we are not confident that it will be done in one 7-hour day. If needed, we can continue it on either Saturday the 7th or Monday the 9th. Please let us know your preference.
Best,
Rachel

**From:** Pullerits, Marina <mpullerits@choate.com>
**Sent:** Tuesday, December 20, 2022 1:25 PM
**To:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Dolphin, Rachel S. <RDolphin@mofo.com>; dfahnestock@morrisnichols.com; kjacobs@morrisnichols.com
**Cc:** MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>; Whitehead, Abigail G. <AWhitehead@ycst.com>; Chivvis, Matthew Alan <MChivvis@mofo.com>; Biogen Tysabri Litigation <biogentysabri@choate.com>
**Subject:** RE: [EXT] RE: Biogen v. Sandoz litigation - 30(b)(6) depositions

Erik,

We anticipate that Dr. Subramanyam's, Dr. Avila's, Mr. O'Connell's, and Dr. Gorelik's depositions will take place in Boston.  We anticipate that Dr. Bloomgren's deposition will take place in Arizona.  We are still working on identifying a location for Mr. de Vilmorin's deposition.

Best,
Marina

**From:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>
**Sent:** Tuesday, December 20, 2022 11:56 AM
**To:** Pullerits, Marina <mpullerits@choate.com>; Dolphin, Rachel S. <RDolphin@mofo.com>; dfahnestock@morrisnichols.com; kjacobs@morrisnichols.com
**Cc:** MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>; Whitehead, Abigail G. <AWhitehead@ycst.com>; Chivvis, Matthew Alan <MChivvis@mofo.com>; Biogen Tysabri Litigation <biogentysabri@choate.com>
**Subject:** RE: [EXT] RE: Biogen v. Sandoz litigation - 30(b)(6) depositions

**External Email**

For the avoidance of doubt and because it affects our ability to say "yes" to these proposals, please provide the cities in which Biogen is proposing to proceed.

**Erik J. Olson** (he/him/his)
Partner
EJOlson@mofo.com
T +1 (650) 813-5825
M +1 (650) 283-5808

Morrison Foerster

755 Page Mill Road
Palo Alto, CA 94304-1018

## MORRISON FOERSTER

mofo.com | LinkedIn | Twitter

**From:** Pullerits, Marina <mpullerits@choate.com>
**Sent:** Tuesday, December 20, 2022 8:09 AM
**To:** Dolphin, Rachel S. <RDolphin@mofo.com>; dfahnestock@morrisnichols.com; kjacobs@morrisnichols.com
**Cc:** MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>; Whitehead, Abigail G. <AWhitehead@ycst.com>; Chivvis, Matthew Alan <MChivvis@mofo.com>; Biogen Tysabri Litigation <biogentysabri@choate.com>
**Subject:** RE: [EXT] RE: Biogen v. Sandoz litigation - 30(b)(6) depositions

**External Email**

Counsel,

Phil de Vilmorin is available for a 30(b)(6) deposition on **January 19**.  Subject to Biogen's objections, he will be covering topics 11-12 and 27-29.  Please let us know as soon as possible whether this date, and the additional dates listed below, work for Sandoz.  We want to make sure we are planning accordingly, particularly given the upcoming holidays.  Once we finalize the dates, we will send along further information on location and timing.

- Dr. Meena Subramanyam: Jan. 4
- Robin Avila (30(b)(6)): Jan.5
- Dan O'Connell (30(b)(6)): Jan. 6
- Dr. Leonid Gorelik: Jan. 11
- Phil de Vilmorin (30(b)(6)): Jan. 19
- Dr. Gary Bloomgren: Jan. 26

Thank you,
Marina

**From:** Pullerits, Marina
**Sent:** Monday, December 19, 2022 4:56 PM
**To:** Dolphin, Rachel S. <RDolphin@mofo.com>; dfahnestock@morrisnichols.com; kjacobs@morrisnichols.com
**Cc:** MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>; Whitehead, Abigail G. <AWhitehead@ycst.com>; Chivvis, Matthew Alan <MChivvis@mofo.com>; Biogen Tysabri Litigation <biogentysabri@choate.com>
**Subject:** RE: [EXT] RE: Biogen v. Sandoz litigation - 30(b)(6) depositions

Rachel,

We were not able to send along Biogen's positions until we reviewed and analyzed Sandoz's proposals for narrowing the topics.  We have now done so, and our responses are in green below your questions.

3

On the topic of scheduling, Robin Avila is available for a 30(b)(6) deposition on **January 5**.  Subject to Biogen's objections, she will be covering topics 4, 6-8, 13, and 25.  Dan O'Connell is available for a 30(b)(6) deposition on **January 6**.  Subject to Biogen's objections, he will be covering topics 1-3, 5, 9-10, 15-19, 21-24, 26, and 30-31.  Biogen is working on witness(es) for the remaining topics.  Please confirm that these dates work for Sandoz.  Likewise, please confirm that the deposition of Dr. Meena Subramanyam can proceed on **January 4**, that the deposition of Dr. Leonid Gorelik can proceed on **January 11**, and that the deposition of Dr. Gary Bloomgren can proceed on **January 26**.  Once Sandoz has confirmed these dates, we will follow up with information regarding timing and location.

Topic 1 – we explained that Biogen's understanding of its licenses, contracts, and agreements related to the PI patents as well as the negotiations of such agreements were relevant to numerous issues in the case, including potential defenses like license and exhaustion. Biogen said it would reconsider its position on whether it will provide someone on the full scope of this topic.

- Biogen stands on its objection that the contracts speak for themselves, and that a non-lawyer cannot and should not be prepared to provide a legal interpretation of their contents.  Subject to these objections and the other objections noted in Biogen's written objections and responses, Biogen will prepare a witness to testify about Biogen's understanding of its rights or obligations under any licenses, contracts, and agreements, and the formation/negotiation of such licenses, contracts, and agreements, as described in Topic 1.

Topic 2—we explained that the requested information is relevant to irreparable harm and public interest, and that this topic should not be limited to the PI patents because Biogen's prior practices and actions in licensing other patents and technologies (or not) could be relevant regardless of the particular patents at issue. Biogen said it would reconsider its position on whether it will provide someone on the full scope of this topic.

- Biogen is continuing to look into this, and will get back to you.  For the avoidance of doubt, Biogen notes that to the extent that this topic seeks information regarding patents/technologies unrelated to any of the Patents-in-Suit, the topic is not relevant and Biogen will not be preparing a witness.

Topics 4, 6, 7, 8 regarding a limitation on draft documents—we noted that we understood Biogen's objections on this point and that we were okay limiting the topics to final versions as long as Biogen would agree to the same limits for its 30b6 topics. We understand that Biogen agreed to this.

- Biogen agrees that neither party will be required to prepare a 30(b)(6) witness on draft (non-final) documents.

Topic 5 – we understand that Biogen is planning to prepare a deponent to discuss this topic.

- Biogen confirms that subject to its objections, Biogen will prepare a witness to testify regarding this topic.

Topics 10 & 11—after discussion, the parties agreed that Sandoz would provide revised clarifying /compromise topics. Please let us know if these resolve your concerns:

- 10: whether, how, and in what manner Biogen or any of its licensees use any of the methods described in U.S. Patent Nos. 10,119,976 and 11,280,794, including whether Biogen has marked or otherwise stated that these patents cover methods that Biogen or its licensees use to test for anti-JCV antibody testing.
  - Biogen responds that subject to its objections, Biogen will prepare a witness to testify regarding whether Biogen has marked that U.S. Patent Nos. 10,119,976 and 11,280,794 cover methods used by Biogen or its licensees to test for anti-JCV antibodies.  Biogen stands on its objections as to the rest of revised Topic No. 10, including because it still improperly seeks Biogen's contentions.  Biogen will not prepare a witness on such issues.

- 11: whether, how, and in what manner Biogen or any of its licensees use any of the methods described in the specifications of U.S. Patent No. 9,096,879 or U.S. Patent No. 10,844,416 (*e.g.,* supplementation with asparagine or manganese), including whether Biogen has marked or otherwise stated that these patents cover methods that Biogen or its licensees use for manufacturing Tysabri, the dates on which each such batch made using these methods was made, and if batches were not made prior to November 2008 using such methods, the date on

which such batches were made and facts supporting and negating how the methods were not necessary to make such batches.

- Biogen responds that subject to its objections, Biogen will prepare a witness to testify regarding whether Biogen has marked that U.S. Patent Nos. 9,096,879 and 10,844,416 cover methods used by Biogen or its licensees for manufacturing Tysabri. Biogen stands on its objections as to the rest of revised Topic No. 11, including because it still improperly seeks Biogen's contentions. Biogen will not prepare a witness on such issues.

Topic 12—we understand that Biogen is planning to prepare a deponent to discuss this topic.

- Biogen confirms that subject to its objections, Biogen will prepare a witness to testify regarding this topic.

Topic 14—after discussion, the parties agreed that Sandoz would provide a revised clarifying/compromise topic. Please let us know if this resolves your concerns:

- How Biogen uses the term "at or below an index value of 0.9" in the context of anti-JCV antibody testing.
  - Biogen maintains that this topic seeks improper legal conclusions, including claim construction and/or expert testimony or opinion, and thus stands on its objections to this topic and will not designate a witness to testify as to this topic.

Topics 15 and 16—you clarified that you did not intend to have a 5 year limitation for these two topics, and we offered to provide a geographical limit of the U.S.

- Biogen confirms that it is not necessarily limiting Topic 15 or 16 to a five-year cutoff. However, Biogen maintains its objections to these topics, including that the requests are so broad that preparing a witness on the full scope is impracticable. Subject to Biogen's objections, Biogen will offer a witness reasonably prepared to testify regarding these topics. Such witness will not be prepared with a memory of specific numbers.

Topic 17—you stated that you do not intend to prepare a witness on the part of this topic related to the purported causality between alleged infringement and any purported harm. We explained our position that Biogen has the burden of showing causality, whether or not there is causality is relevant to the irreparable harm inquiry and is a fact question, and we are entitled to know and probe the purported facts supporting or negating causality. You stated that you did not intend to prepare a witness on the causality aspect of this topic. Please let us know if you have reconsidered this position, or whether you agree to our proposal above.

- As previously noted, Biogen's witness will be prepared to testify regarding the facts, including factual underpinnings for questions relating to harm. To the extent questions reach the legal issue of causation (or are otherwise properly the subject of expert testimony), Biogen's witness will not be prepared to address them.

Topic 18—we understand that Biogen is planning to prepare a deponent to discuss this topic.

- Biogen responds that subject to its objections, Biogen will prepare a witness to testify regarding this topic. Biogen reiterates its objection to this topic to the extent that it seeks expert testimony or opinion.

Topic 19—we asked whether Biogen was intending to limit topic 19 in any way by its response, and Biogen stated that it would get back to us on this.

- Biogen responds that subject to its objections, which are not intended to carve out particular categories of information requested by Sandoz, Biogen agrees to produce a witness to testify as to information within Biogen's possession, custody, or control.

Topic 23—you confirmed that you did intend to limit this topic to the past 5 years. We explained that Stratify is discussed numerous times in Biogen's complaint and infringement contentions, and this request is relevant to irreparable harm and public interest. We also noted that Stratify has been on the market for less time than Tysabri and thus full preparation should not be unduly burdensome. Biogen said it would reconsider its position on whether it will provide someone on the full scope of this topic.

- Biogen is continuing to look into this, and will get back to you.

Topic 26—we explained the potential relevance of communications with the NIH to invalidity and other defenses, and explained why it was not proper to limit the topic to documents that Biogen has produced related to NIH, as we do not know whether such production is complete or contains all of the relevant communications. Biogen said it would reconsider its position on whether it will provide someone on the full scope of this topic.

- Subject to its objections, Biogen will offer a witness reasonably prepared to discuss Biogen's communications with NIH, if any.

Topic 27—after discussion, the parties agreed that Sandoz would provide a revised clarifying/compromise topic. Please let us know if this resolves your concerns:

- The development, manufacture, and quality control of Tysabri that ends up in the U.S.
  - The revised topic remains overbroad. The topic is not limited to any particular time period, and Tysabri has been on the market for almost 20 years. Can Sandoz propose a further narrowed version?

Topics 28 and 29—we explained how our requests were broader than what Biogen agreed to provide, and explained the potential relevance of these topics to invalidity. We acknowledged that Biogen may not know the answer to these questions beyond Biogen products or methods, but we are entitled to ask questions and probe this knowledge or lack thereof. Biogen said it would reconsider its position on whether it will provide someone on the full scope of these topics.

- With regard to Topic 28, Biogen agrees to withdraw its objection to providing testimony about non-Biogen products. As noted, however, Biogen will only prepare a witness to testify regarding information within the possession, custody, or control of Biogen.
- With regard to Topic 29, Biogen objects to this topic to the extent it calls for legal and/or expert testimony. Biogen also stands on its objection to providing testimony about the practices of entities other than Biogen, which would require speculation and is not reasonably calculated to lead to the discovery of admissible evidence. If Sandoz proposes a revised version of this topic, Biogen will consider it.

Topic 30—after discussion, the parties agreed that Sandoz would provide a revised clarifying/compromise topic. Please let us know if this resolves your concerns:

- Biogen's knowledge regarding the following documents:
  - BIOG-TYS0000080181
  - BIOG-TYS0000080182
  - BIOG-TYS0000080187
  - BIOG-TYS0000080188
  - BIOG-TYS0000080189
  - BIOG-TYS0000080190
  - BIOG-TYS0000080192
  - BIOG-TYS0000080193
  - BIOG-TYS0000080194
  - BIOGTYS00000808187
  - BIOGTYS00000808188
- Biogen responds that these documents speak for themselves and it is unclear what is meant by "Biogen's knowledge regarding" the listed documents. Subject to its objections, however, Biogen will prepare a witness to testify regarding the documents listed in this narrowed topic. Biogen notes that Sandoz's references to BIOGTYS00000808187 and BIOGTYS00000808188 appear to be incorrect, however. Please confirm that Sandoz intended to refer to BIOGTYS0000080187 and BIOGTYS0000080188. Please likewise confirm that each of the above Bates numbers corresponds to pages within the Stratify Insert (BIOGTYS0000080187) or the Master Lab Services Agreement with Focus (BIOGTYS0000080157).

Topic 32 re authenticity – we noted that both sides included a similar 30(b)(6) topic and asked if Biogen would be open to an authenticity stipulation in the future in lieu of preparing someone on this topic, and in the event the parties do not agree to a stipulation then each could have a limited deposition on this topic. Biogen stated that it would get back to us on this.

- Topic No. 11: "Any investigation, evaluation, or analysis (including the timing of and factual bases considered) of whether or not ██████ the corresponding planned REMS program, or any anti-JCV antibody assay infringes or will infringe any claim of the Asserted Patents (including any non-infringement opinions)."
  - Notwithstanding its objection, Sandoz agreed to offer a witness prepared on this Topic.  To the extent the referenced "investigation, evaluation, or analysis" is privileged, the witness will be prepared to answer questions on the level of a privilege log.  Our witness will be prepared to answer to the extent we understand is required in this district, while maintaining and not waiving privilege.  To be clear, we do not intend to waive privilege on this topic in the upcoming 30(b)(6) depositions for the PI proceedings, although we reserve the right to do so at a later stage in the case.

Anita

**From:** Dolphin, Rachel S. <RDolphin@mofo.com>
**Sent:** Friday, December 2, 2022 7:18 PM
**To:** Biogen Tysabri Litigation <biogentysabri@choate.com>; dfahnestock@morrisnichols.com; kjacobs@morrisnichols.com
**Cc:** MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>; Whitehead, Abigail G. <AWhitehead@ycst.com>
**Subject:** Biogen v. Sandoz litigation - 30(b)(6) depositions

**\*\*External Email\*\***

Counsel,

I understand that Eric M. and Erik O. discussed this earlier, but we wanted to follow-up with an email. We have two 30(b)(6) witnesses: Linda Staikos (available for deposition Dec. 9) and Paul Delo (available for deposition Dec. 14). We will be producing them in Princeton, New Jersey and likely can secure another counsel's offices for use there. While we may have some slight changes, here are our current designations for the topics. All designations are subject to our objections and responses, as clarified by the meet and confer today.

Linda Staikos: 1-6*, 8-9
Paul Delo: 6*-7, 10-11

We anticipate that Linda and Paul will each cover certain aspects of topic 6.

Best,
Rachel

===========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

Choate Hall & Stewart LLP Confidentiality Notice:
This message is transmitted to you by or on behalf of the law firm of Choate, Hall & Stewart LLP. It is intended exclusively for the individual or entity to which it is addressed. The substance of this message, along with any attachments, may contain information that is proprietary, confidential and/or legally privileged or otherwise legally exempt from disclosure. If you are not the designated recipient of this message, you are not authorized to read, print,

# EXHIBIT 9

HIGHLY CONFIDENTIAL

1

2

3

          IN THE UNITED STATES DISTRICT COURT

4             FOR THE DISTRICT OF DELAWARE

5

        Case No. 22-1190 (GBW)

6

7       BIOGEN, INC., and BIOGEN        )
        MA, INC.,                       )
8                    Plaintiffs,        )
                                        )
9       vs.                             )
                                        )
10      SANDOZ, INC., and POLPHARMA     )
        BIOLOGICS S.A.,                 )
11                   Defendants.        )

12

13            VIDEOTAPED 30(b)(6) DEPOSITION

14      OF BIOGEN, INC., THROUGH DANIEL O'CONNELL,

15      called as a witness on behalf of the

16      Defendants, pursuant to the applicable

17      provisions of the Federal Rules of Civil

18      Procedure, before Jeanette N. Maracas,

19      Registered Professional Reporter and Notary

20      Public in and for the Commonwealth of

21      Massachusetts, at the Offices of Morrison &

22      Foerster, LLP, 200 Clarendon Street, Boston,

23      Massachusetts, on Friday, January 6, 2023,

24      commencing at 9:03 a.m.

25

                                        Page 1

HIGHLY CONFIDENTIAL



**Page 2**

```
1   APPEARANCES:
2
3      CHOATE, HALL & STEWART
       By: Sophie F  Wang, Esq
4      By: Benjamin A  DuBois, Esq
       Two International Place
5      Boston, Mass  02110
       For the Plaintiffs
6      Swang@choate com
       Bdubois@choate com
7
8      MORRISON & FOERSTER, LLP
       By: Erik J  Olson, Esq
9      By: Rachel S  Dolphin, Esq
       By: Theresa Tan, Esq
10     755 Page Mill Road
       Palo Alto, CA 94304
11     For the Defendants
       Ejolson@mofo com
12     Rdolphin@mofo com
       Ttan@mofo com
13
14     Geoff Bassett, Videographer
15
       ALSO PRESENT:
16
       Brian Larivee, Esq
17     Biogen in-house counsel
18
19
20
21
22
23
24
25
```

**Page 4**

```
1
       (Exhibits continued)
2
3
       No        Description     Page
4
5
```

**Page 3**

```
1      I N D E X
2   Testimony of:      Direct Cross
3   Daniel O'Connell
4   (by Mr  Olson)        7
5
6      E X H I B I T S
7   No    Description    Page
8
```

**Page 5**

```
1
2           DOCUMENTS PREVIOUSLY MARKED
3                 AND REFERENCED
4
```

HIGHLY CONFIDENTIAL

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | VIDEOGRAPHER: Good morning,    08:24:15 |
| 3 | everyone. The time is now 9:03 a.m. and    09:03:49 |
| 4 | we're on the record. We are here today to    09:03:53 |
| 5 | take the deposition of Dan O'Connell in    09:03:55 |
| 6 | the matter of Biogen, Incorporated, et al.,    09:03:58 |
| 7 | versus Sandoz, Incorporated, et al.    09:04:01 |
| 8 | My name is Geoffrey Bassett    09:04:04 |
| 9 | with Veritext. We are here at Morrison &    09:04:06 |
| 10 | Foerster, LLP, in Boston, Massachusetts. At    09:04:11 |
| 11 | this time we'll ask the attorneys to    09:04:13 |
| 12 | introduce themselves.    09:04:14 |
| 13 | MR. OLSON: From Morrison & Foerster  09:04:16 |
| 14 | representing Sandoz, Erik Olson, and with me  09:04:19 |
| 15 | is Rachel Dolphin and Theresa Tan.    09:04:24 |
| 16 | MS. WANG: Sophie Wang on behalf    09:04:24 |
| 17 | of Biogen from Choate, Hall & Stewart, and    09:04:27 |
| 18 | with me is Ben DuBois also from Choate, Hall  09:04:29 |
| 19 | & Stewart, and Brian Larivee from Biogen.    09:04:31 |
| 20 | VIDEOGRAPHER: At this time I will    09:04:35 |
| 21 | hand it over to the court reporter.    09:04:36 |
| 22 | DANIEL O'CONNELL    09:04:38 |
| 23 | A witness called for examination |
| 24 | by counsel for the Defendants, having been |
| 25 | first duly sworn, was examined and testified |
| | Page 6 |

| | |
|---|---|
| 1 | Q. And that oath is the same oath that you    09:05:43 |
| 2 | would give in a court of law?    09:05:46 |
| 3 | A. Understood.    09:05:48 |
| 4 | Q. The purpose of this proceeding is so that    09:05:48 |
| 5 | I can ask you questions, you give answers    09:05:52 |
| 6 | under oath and then those can be used as a    09:05:53 |
| 7 | part of the proceeding. Do you understand    09:05:56 |
| 8 | that?    09:05:57 |
| 9 | A. I do.    09:05:57 |
| 10 | Q. We'll cover it in a second, but in this    09:05:58 |
| 11 | context, you're here as a representative of    09:06:02 |
| 12 | Biogen. Do you understand that?    09:06:04 |
| 13 | A. I do.    09:06:06 |
| 14 | Q. One of the things in order to have a good    09:06:06 |
| 15 | transcript is that we try not to interrupt    09:06:10 |
| 16 | one another. So you may very well do a    09:06:13 |
| 17 | very good job of anticipating my question    09:06:15 |
| 18 | and I may do a good job of anticipating    09:06:18 |
| 19 | your response, but we should try to let each  09:06:21 |
| 20 | other finish before the other one begins.    09:06:23 |
| 21 | Make sense?    09:06:25 |
| 22 | A. That does.    09:06:26 |
| 23 | Q. All right. And if there's a time in which    09:06:27 |
| 24 | you don't understand my question, I'd ask you  09:06:31 |
| 25 | to tell me so that I could try to clarify it  09:06:34 |
| | Page 8 |

| | |
|---|---|
| 1 | as follows: |
| 2 | DIRECT EXAMINATION |
| 3 | BY MR. OLSON: |
| 4 | Q. Mr. O'Connell, have you been deposed before?  09:04:47 |
| 5 | A. I have not.    09:04:51 |
| 6 | Q. Have you given testimony in court before?    09:04:51 |
| 7 | A. Yes.    09:04:55 |
| 8 | Q. All right. In what context?    09:04:56 |
| 9 | A. It was a criminal matter with a friend.    09:04:59 |
| 10 | Q. Okay. And what was the purpose of your    09:05:04 |
| 11 | testimony?    09:05:08 |
| 12 | A. I was a character witness.    09:05:08 |
| 13 | Q. How long ago was that?    09:05:10 |
| 14 | A. More than 20 years, 1997-ish.    09:05:13 |
| 15 | Q. Okay. Let me go over a couple of things    09:05:17 |
| 16 | about depositions. As you know, I believe,    09:05:22 |
| 17 | the whole of the session, my questions,    09:05:26 |
| 18 | your answers will be recorded as well, both    09:05:29 |
| 19 | stenographically by the court reporter here    09:05:33 |
| 20 | to my right and from the video. You    09:05:35 |
| 21 | understand that, correct?    09:05:37 |
| 22 | A. I do.    09:05:38 |
| 23 | Q. You understand that you've just given an    09:05:39 |
| 24 | oath to tell the truth, correct?    09:05:42 |
| 25 | A. I do.    09:05:43 |
| | Page 7 |

| | |
|---|---|
| 1 | and I'll do my best, all right?    09:06:37 |
| 2 | A. Okay.    09:06:39 |
| 3 | Q. Is there any reason that you can think of    09:06:40 |
| 4 | why you cannot give good and accurate    09:06:43 |
| 5 | testimony on behalf of Biogen today?    09:06:45 |
| 6 | A. Not that I'm aware of.    09:06:47 |
| 7 | Q. All right. What is your home address, for    09:06:49 |
| 8 | the benefit of the record?    09:06:52 |
| 9 | ▮ |
| 10 | ▮    09:06:59 |
| 11 | Q. What is your current role at Biogen?    09:07:00 |
| 12 | A. I'm a senior director, global MS franchise    09:07:03 |
| 13 | lead.    09:07:06 |
| 14 | Q. For how long have you held that position?    09:07:06 |
| 15 | A. I've been in this role for four months.    09:07:08 |
| 16 | Q. What was your position before that?    09:07:11 |
| 17 | A. I was a global commercial strategy lead for  09:07:14 |
| 18 | the Tysabri PDC committee.    09:07:17 |
| 19 | Q. Was the change four months ago a material    09:07:20 |
| 20 | change in the nature of your roles and    09:07:22 |
| 21 | responsibilities?    09:07:25 |
| 22 | A. I'm not sure I understand what you mean    09:07:26 |
| 23 | by "material."    09:07:29 |
| 24 | Q. Was it a significant change?    09:07:29 |
| 25 | A. Yes, yes, it was a change.    09:07:31 |
| | Page 9 |

3 (Pages 6 - 9)

| | |
|---|---|
| 1  Q. When did you join Biogen?               09:07:35 | 1     what does that mean inside of Biogen?      09:10:36 |
| 2  A. April 14th, 2014.                        09:07:38 | 2  A. Sure. It's primarily a commercial team,    09:10:38 |
| 3  Q. Can you just, going forward from April '14  09:07:41 | 3     but it actually encompasses a group of      09:10:40 |
| 4     to the present, let me know the positions   09:07:48 | 4     folks cutting across all disciplines that   09:10:43 |
| 5     you've held and a general sense of what they  09:07:50 | 5     would be involved in bringing either        09:10:46 |
| 6     involved from there to the present.        09:07:52 | 6     maintaining a product on market or bringing  09:10:49 |
| 7  A. Sure. I was a, starting in April of 2014   09:07:52 | 7     a product to market, so it includes         09:10:51 |
| 8     I was a senior product manager working on  09:07:55 | 8     representatives from medical, from R&D, from 09:10:53 |
| 9     Tysabri in the United States. That role    09:07:59 | 9     legal, from regulatory. I'm sure there's    09:10:57 |
| 10    included working on strategy, product       09:08:04 | 10    others that I'm missing.                     09:11:00 |
| 11    strategy, product execution, strategic      09:08:08 | 11  Q. You started with Tysabri in April of 2014.  09:11:01 |
| 12    execution, development of materials for     09:08:13 | 12    You worked with Tysabri until you went to,   09:11:11 |
| 13    HCP engagement. From there, in roughly      09:08:14 | 13    I think it was Spinraza, you said. That      09:11:14 |
| 14    October of 2015, I moved into a role on our 09:08:20 | 14    wasn't the trade name at the time?           09:11:18 |
| 15    developing rare disease group as a senior   09:08:26 | 15  A. Yes.                                         09:11:19 |
| 16    product manager for a product called SMNRx, 09:08:28 | 16  Q. And when did you move to Spinraza?           09:11:20 |
| 17    which later became known as Spinraza, and   09:08:33 | 17  A. October of 2015.                             09:11:23 |
| 18    that role I held for, until May of 2016, at 09:08:36 | 18  Q. Okay. From October '15 to March of 2019,    09:11:26 |
| 19    which point I was named the east regional   09:08:43 | 19    did your roles have anything to do with      09:11:31 |
| 20    sales director for Spinraza, for the launch 09:08:46 | 20    Tysabri?                                      09:11:34 |
| 21    of Spinraza. I held that role until August  09:08:50 | 21  A. No.                                          09:11:38 |
| 22    of 2018, at which point I moved on to the    09:08:54 | 22  Q. From March 2019 to, I think I have it down   09:11:39 |
| 23    aducanumab product development and          09:09:02 | 23    as November of 2019, you had worked on       09:11:45 |
| 24    commercialization team as an associate      09:09:05 | 24    Tecfidera, correct?                           09:11:49 |
| 25    director where we were focused on developing 09:09:06 | 25  A. That's correct.                              09:11:50 |
| Page 10 | Page 12 |
| 1     strategy and bringing aducanumab to market. 09:09:09 | 1  Q. That's an MS product?                        09:11:50 |
| 2     I held that role until March of 2019, at   09:09:16 | 2  A. Yes.                                          09:11:54 |
| 3     which point I was appointed the director,  09:09:20 | 3  Q. And in addition to whatever work you did     09:11:54 |
| 4     global commercial lead for Tecfidera,      09:09:24 | 4     on the Tecfidera PDC, did your role have     09:11:58 |
| 5     Tecfidera PDC. I held that role until      09:09:27 | 5     anything to do with Tysabri?                 09:12:01 |
| 6     October of 2019 or, actually, November of  09:09:32 | 6     ████████████████        ████████ |
| 7     2019, I apologize, at which point I returned 09:09:36 | ▮ ████████████      ████████ |
| 8     to the aducanumab PDC. I was with the      09:09:40 | ▮ █████████     ███████ |
| 9     aducanumab PDC until July of 2020, at which 09:09:46 | ▮ █████████████ |
| 10    point I came to the Tysabri PDC as the      09:09:52 | ▮ ███████████      ████████ |
| 11    global commercial strategy lead. I held that 09:09:56 | ▮ ████████████ |
| 12    role until October 1st, 2022.               09:09:59 | 09:12:24 |
| 13  Q. And then took your current role?          09:10:07 | 14  Q. Okay. From November of 2019 to July of 2020  09:12:27 |
| 14  A. Yes, that's correct.                      09:10:08 | 15    when you went back to working on Aduhelm,     09:12:32 |
| 15  Q. Okay. Let me catch a couple of things in  09:10:09 | 16    did you have any involvement or work with    09:12:35 |
| 16    there. You used the word "HCP." That's     09:10:16 | 17    respect to Tysabri?                           09:12:37 |
| 17    healthcare provider?                        09:10:18 | 18  A. I did not.                                    09:12:38 |
| 18  A. Yes, that's correct.                      09:10:19 | 19  Q. What was the nature of your role starting    09:12:38 |
| 19  Q. Aducanumab, that's Aduhelm as well?       09:10:20 | 20    in July of 2020 as it relates to Tysabri?    09:12:44 |
| 20  A. Yes.                                       09:10:25 | 21  A. ████████████████        ████████ |
| 21  Q. PDC, you used that a number of times. What 09:10:25 | ▮ ████████████      ███████ |
| 22    does that refer to?                         09:10:28 | ▮ ████████      ████████ |
| 23  A. Sure. Product development and             09:10:29 | ▮ ███████████████ |
| 24    commercialization.                          09:10:32 | |
| 25  Q. And when you talked about that as a team,  09:10:32 | |
| Page 11 | Page 13 |

HIGHLY CONFIDENTIAL



18   Q.  To whom do you report?                    09:19:03
19   A.  Currently I report to someone named Carl        09:19:11
20        Olson.                                    09:19:16
21   Q.  And to whom does Mr. Olson report?            09:19:16
22   A.  Rachid Izzar.                              09:19:17
23   Q.  And to whom does Mr. Izzar report?            09:19:21
24   A.  Chris Viehbacher.                          09:19:21
25   Q.  Who is?                                    09:19:21

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

1  A. The chief executive officer.                09:19:23
2  Q. Who joined when?                            09:19:25
3  A. November of 2022.                           09:19:28
4  Q. Do the leads for each of the products report  09:19:38
5     to you or is it done by functional area,    09:19:41
6     so to speak?                                09:19:46
7        MS. WANG: Objection.                     09:19:46
8  Q. Let me make a better question. Who reports  09:19:48
9     to you?                                     09:19:50
10 A. Reports to me? I do not have any direct     09:19:50
11    reports.                                    09:19:55
12 Q. Okay. So yours is a coordinating role across  09:19:55
13    the franchise?                              09:19:59
14 A. To a degree, yes.                           09:20:00
15 Q. The prior position that you had, did you    09:20:02
16    have direct reports?                        09:20:11
17 A. Yes, I did.                                 09:20:12
18 Q. And what were those?                        09:20:13
19 A. I had a rotational associate who was        09:20:15
20    reporting to me for a nine-month range, I   09:20:18
21    had a series of them, MBA rotational        09:20:21
22    associate, so across, about two or three of  09:20:25
23    them across an 18-month period.             09:20:29
24 Q. Can you briefly describe to me your work    09:20:31
25    prior to -- your employment, that is, prior  09:20:36

Page 18

1  to April of 2014 with any particular          09:20:38
2  reference on work associated with an MS        09:20:42
3  product?                                       09:20:45
4        MS. WANG: Objection.                     09:20:46
5  A. So prior to April of 2014, I worked at      09:20:52
6     Genzyme from October 31st of 2011 until     09:20:57
7     whatever the previous Monday would have     09:21:08
8     been from when I started at Biogen.         09:21:10
9  Q. And did that role have anything to do with  09:21:12
10    MS?                                         09:21:15
11 A. It did not.                                 09:21:15
12 Q. What position did you have before that?     09:21:17
13 A. Before which?                               09:21:21
14 Q. Before Genzyme.                             09:21:22
15 A. Prior to Genzyme, I worked at Pfizer.       09:21:24
16 Q. Did that role have anything to do with MS?  09:21:27
17 A. It did not.                                 09:21:30
18 Q. Were those both marketing roles?            09:21:30
19 A. Genzyme was a marketing role.               09:21:33
20 Q. What was the role at Pfizer?                09:21:35
21 A. At Pfizer I was in a marketing capacity as  09:21:37
22    well as in a sales capacity.                09:21:41
23 Q. And what is that distinction, for the benefit  09:21:42
24    of the court and jury?                      09:21:46
25 A. So a sales representative has responsibility  09:21:48

Page 19

1  for the promotion of a product directly       09:21:53
2  to an HCP, healthcare professional, so we     09:21:56
3  do not collect -- we don't collect the        09:22:02
4  purchase orders, per se, in the pharma        09:22:07
5  biotech industry. So I was promoting          09:22:11
6  products from Pfizer's portfolio versus in    09:22:14
7  a marketing capacity you are understanding    09:22:18
8  strategy, understanding the tactics that      09:22:22
9  would be utilized to support that strategy,   09:22:24
10 you're developing and driving strategy and    09:22:27
11 tactics for use by, typically by a sales      09:22:29
12 team or by some other promotional team,       09:22:33
13 whether it's digital promotion on personal    09:22:37
14 or a personal, direct personal promotion.     09:22:41
15 Q. While you've been at Biogen, have you had   09:22:41
16    any sales role?                             09:22:44
17 A. I was a sales leader, as I noted before.    09:22:45
18 Q. For which product?                          09:22:48
19 A. For Spinraza.                               09:22:51
20 Q. Have you had any sales role with respect to  09:22:51
21    any MS product?                             09:22:53
22 A. I have not.                                 09:22:56
23 Q. Before Pfizer, what did you do?             09:22:58
24 A. I worked in software.                       09:23:02
25 Q. Can you describe for me your educational    09:23:04

Page 20

1  background after high school and any          09:23:11
2  degrees or certificates you received.         09:23:13
3  A. Sure. I have a Bachelor of Science from     09:23:14
4     the University of Rhode Island and I have a  09:23:19
5     Master's in business administration from    09:23:22
6     Boston College.                             09:23:24
7  Q. The degree from Rhode Island you got when?  09:23:24
8  A. 1996.                                       09:23:27
9  Q. And the MBA?                                09:23:28
10 A. 2003.                                       09:23:29
11 Q. Do you have any certificates, degrees or    09:23:30
12    otherwise that are science-related?         09:23:34
13 A. I do not.                                   09:23:36
14 Q. Do you have any degrees or certificates     09:23:37
15    that are medically-related?                 09:23:43
16 A. I do not.                                   09:23:45
17 Q. One of the things that's occurring here is  09:23:46
18    that you are speaking on behalf of Biogen   09:23:56
19    with respect to certain specific topics.    09:24:00
20    Do you understand that?                     09:24:02
21 A. I do.                                       09:24:03
22 Q. What is your understanding as to why you    09:24:03
23    were chosen to represent Biogen with respect  09:24:09
24    to those topics?                            09:24:12
25        MS. WANG: Objection. I'm also           09:24:13

Page 21

6 (Pages 18 - 21)

**Page 22**

1    going to caution you not to reveal the          09:24:15
2    substance of any communications that you've     09:24:19
3    had with lawyers about this.  If you can        09:24:20
4    answer without doing that, you can answer.      09:24:23
5  A.  I am here representing Biogen based on my     09:24:26
6    experience.                                     09:24:29
7  Q.  And do you have any other understanding as    09:24:30
8    to why it is you've been chosen?                09:24:32
9  A.  No.                                           09:24:34
10  Q.  Okay.  If you'll take a look at the first    09:24:34
11    document that's at the top of the stack        09:24:34
12    there, it's previously been marked as          09:24:39
13    Exhibit 1023, and I'm going to -- and I'm      09:24:42
14    happy to give you a pen if it's helpful to     09:24:48
15    you.  I'm just going to tick down the topics   09:24:50
16    that I understand you to be designated on,     09:24:52
17    then you can take a look at those and you can  09:24:56
18    confirm to me whether or not you agree.        09:24:58
19  A.  A pen would be great.                        09:25:00
20  Q.  All right.                                    09:25:01
21  A.  Thank you.                                    09:25:02
22        MS. WANG:  I'm just going to note          09:25:03
23    for the record that Exhibit 1023 is obviously  09:25:04
24    Sandoz' notice of deposition.  We have served  09:25:08
25    written objections and responses and there's   09:25:10

**Page 23**

1    been significant colloquy via e-mail          09:25:13
2    further limiting the scope of each of these    09:25:13
3    topics and we believe those control.          09:25:18
4  Q.  So here are the topics that I believe you   09:25:21
5    are designated on, and you can tell me        09:25:24
6    whether or not you agree with my list, and    09:25:27
7    it starts on Page 2 at the bottom, so Topic   09:25:32
8    1.                                            09:25:38
9  A.  Under Attachment A?                          09:25:38
10  Q.  Correct.  Topic 1, Topic 2, 3, 5, 9, 10,    09:25:40
11    15, 16, 17, 18, 19, 22.                       09:25:56
12  A.  Hold on a second, please.                    09:26:11
13  Q.  Sure.                                        09:26:12
14  A.  9, 10.                                        09:26:26
15  Q.  Let me back you up.  All right.  So 9, 10,   09:26:29
16    and on Page 5 now.  Are you on Page 5?        09:26:34
17  A.  Yes.                                          09:26:34
18  Q.  Okay.  15, 16, 17, 18, 19, 22, 23, 24, 26,  09:26:35
19    30 and 31.  Take a look at those and tell me  09:27:01
20    if you agree that those are the topics on     09:27:10
21    which you have been designated to testify.    09:27:12
22        MS. WANG:  And, again, while you're       09:27:15
23    looking at that, just noting for the record   09:27:16
24    that these are all subject to Biogen's        09:27:19
25    responses and objections, including via       09:27:21

**Page 24**

1    e-mail, and the witness is only prepared      09:27:23
2    for the questions that we expressly           09:27:30
3    delineated via communications with counsel.   09:27:31
4  A.  (Witness examines document)  Yup, understood. 09:27:59
5  Q.  Let me, I have a specific question, actually, 09:28:09
6    of counsel and it goes to the objections.     09:28:16
7    On No. 2 and/or -- well, let me -- let me try  09:28:21
8    it with you first, Mr. O'Connell, and your    09:28:25
9    counsel can help me as needed.                09:28:29
10        On No. 2 specifically, which is on        09:28:32
11    Page 3 of the attachment --                   09:28:34
12  A.  Yup.                                          09:28:34
13  Q.  -- are you here to testify about in-licenses 09:28:36
14    and out-licenses as they relate to Tysabri    09:28:39
15    or as to any product whatsoever within the    09:28:42
16    Biogen portfolio?                             09:28:45
17  A.  It's my understanding that I'm here to      09:28:48
18    testify overall as it relates to Tysabri.     09:28:50
19  Q.  Okay.  All right.  Then let me ask you, what 09:28:55
20    have you done to prepare yourself to testify  09:29:01
21    on behalf of Biogen with respect to the       09:29:03
22    topics?                                       09:29:05
23  A.  I have conferred with counsel.              09:29:06
24  Q.  Have you done anything else?                09:29:08
25        MS. WANG:  Objection.                      09:29:10

**Page 25**

1  A.  I -- outside of -- I'm not sure -- can you   09:29:14
2    rephrase the question?  I'm not sure I         09:29:20
3    understand.                                    09:29:22
4  Q.  Sure.  In preparing -- well, I think you    09:29:22
5    did prepare to be able to testify on behalf   09:29:27
6    of Biogen with respect to these topics,       09:29:30
7    correct?                                       09:29:33
8  A.  I conferred with counsel.                    09:29:33
9  Q.  Well, do you have difficulty -- I understand 09:29:34
10    you conferred with counsel and met with       09:29:38
11    counsel.  Would you agree that that was done  09:29:39
12    as preparation to testify on behalf of Biogen 09:29:41
13    on these topics?                              09:29:43
14  A.  I met with counsel in preparation for this  09:29:45
15    deposition.                                   09:29:48
16  Q.  Okay.  And you said a moment ago that you   09:29:49
17    believe you're relying on your experience to  09:29:53
18    provide testimony, correct?                   09:29:56
19        MS. WANG:  Objection.                      09:29:58
20  A.  It's hard for me to understand what they    09:29:59
21    believe or what they don't believe, but it's  09:30:04
22    my understanding that I'm here because of my  09:30:06
23    background and my experience.                 09:30:09
24  Q.  All right.  And we covered that experience a 09:30:11
25    second ago, correct?                          09:30:14

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

| | |
|---|---|
| 1  A. Yes, we did.                              09:30:17 | 1  Q. For how long is briefly?               09:33:15 |
| 2  Q. Is there something about your experience  09:30:18 | 2  A. 20 minutes.                            09:33:17 |
| 3    that I didn't cover a few minutes ago that 09:30:24 | 3  Q. Topic of the conversation?             09:33:19 |
| 4    you think were particularly relevant to    09:30:27 | 4      MS. WANG: Objection, and I'm          09:33:23 |
| 5    these topics?                             09:30:28 | 5    going to caution you just not to reveal the  09:33:25 |
| 6      MS. WANG: Objection.                     09:30:29 | 6    substance of any discussions you had with  09:33:26 |
| 7  A. It's hard for me to really know. I mean,  09:30:30 | 7    counsel.                                 09:33:29 |
| 8    in any job in any kind of skillset you cover  09:30:34 | 8  Q. In the conversation with Mr. Lee, what was  09:33:31 |
| 9    various things, so it's hard for me to know,  09:30:37 | 9    the topic of discussion?                 09:33:33 |
| 10    to understand 100 percent what would be   09:30:41 | 10  A. General pricing dynamics and general pricing  09:33:35 |
| 11    relevant. So, I mean, based on my background  09:30:43 | 11    principles.                             09:33:39 |
| 12    and experience, I believe that's why I'm  09:30:45 | 12  Q. As it relates to Tysabri?              09:33:39 |
| 13    here.                                    09:30:47 | 13  A. No.                                    09:33:41 |
| 14  Q. Yeah, maybe I can -- is there another role,  09:30:47 | 14  Q. As it relates to what products?        09:33:45 |
| 15    title or responsibility that you have at  09:30:50 | 15  A. There were no products discussed. It was  09:33:47 |
| 16    Biogen that we haven't covered and that you  09:30:55 | 16    just a general discussion.               09:33:49 |
| 17    think makes you specifically suited to   09:30:59 | 17  Q. Why talk to Mr. Lee? What was he in a  09:33:51 |
| 18    testify to these topics?                 09:31:01 | 18    position to provide you that you didn't   09:33:54 |
| 19  A. Not that I'm aware of.                   09:31:03 | 19    think you had?                           09:33:57 |
| 20  Q. Okay. One of the things you did was to    09:31:04 | 20      MS. WANG: Objection, and again        09:33:57 |
| 21    confer with counsel. With whom did you   09:31:08 | 21    caution the witness not to reveal the    09:34:00 |
| 22    confer?                                  09:31:11 | 22    communications that you've had with counsel.  09:34:01 |
| 23  A. Sophie, Ben and Brian.                   09:31:12 | 23  A. I'm going to pause and ask counsel if   09:34:04 |
| 24  Q. Anyone else?                             09:31:17 | 24    that's privileged.                       09:34:10 |
| 25  A. I met with someone named Bill Lee.       09:31:18 | 25  Q. Sure. Do you intend -- were you asking  09:34:12 |
|                                    Page 26 |                                    Page 28 |
| 1  Q. Bill Lee from the Wilmer Hale firm?      09:31:25 | 1    him questions in order to get information  09:34:16 |
| 2  A. No. He's an internal associate.          09:31:28 | 2    that would be helpful to you in providing  09:34:18 |
| 3  Q. All right. What's Mr. Lee's role?        09:31:31 | 3    testimony with respect to these topics?   09:34:20 |
| 4  A. He is a senior director of pricing.      09:31:33 | 4      MS. WANG: You can answer yes or no.    09:34:24 |
| 5  Q. All right. Anyone else?                   09:31:36 | 5  A. Yes.                                    09:34:26 |
| 6  A. Yes. Donald Poole.                        09:31:39 | 6  Q. Okay. What were you seeking from him that  09:34:26 |
| 7  Q. Anyone else? What's Mr. Poole's role?    09:31:43 | 7    would be helpful to these topics?         09:34:30 |
| 8  A. He's a senior manager of accounting.     09:31:49 | 8  A. General background.                     09:34:33 |
| 9  Q. Anyone else?                             09:31:52 | 9  Q. And what did he tell you about that general  09:34:37 |
| 10  A. No.                                     09:31:53 | 10    background?                             09:34:41 |
| 11  Q. For the moment -- I'm going to come back to  09:31:54 | 11  A. He gave me general background on pricing.  09:34:41 |
| 12    the Bill Lee and Donald Poole pieces, but  09:32:06 | 12  Q. And what was that general background?   09:34:44 |
| 13    when -- well, on how many occasions did you  09:32:11 | 13  A. I mean, it's how kind of a biotech       09:34:47 |
| 14    meet with counsel?                       09:32:14 | 14    pharmaceutical company would work on, may  09:34:52 |
| 15  A. Three.                                   09:32:15 | 15    set pricing dynamics or may think about   09:34:59 |
| 16  Q. Collectively for how long?              09:32:22 | 16    pricing.                                 09:35:02 |
| 17  A. Somewhere probably around ten hours total.  09:32:24 | 17  Q. Give me a summary as you would give to the  09:35:03 |
| 18  Q. And when was the last time?             09:32:33 | 18    jury of what Mr. Lee told you about how   09:35:07 |
| 19  A. Yesterday.                              09:32:35 | 19    Biogen may set the pricing.              09:35:10 |
| 20  Q. For how long did you meet yesterday?    09:32:36 | 20      MS. WANG: Objection, and, again, to   09:35:11 |
| 21  A. Roughly the business day, which I would  09:32:39 | 21    the extent that you were in communications  09:35:15 |
| 22    define as approximately seven hours.     09:32:52 | 22    with Mr. Lee and counsel, be careful about  09:35:15 |
| 23  Q. When did you meet with Mr. Lee?         09:32:56 | 23    what you communicate. Do not disclose any  09:35:19 |
| 24      MS. WANG: Objection.                    09:33:05 | 24    substantive discussions you've had with   09:35:22 |
| 25  A. So I spoke with Mr. Lee briefly yesterday.  09:33:08 | 25    counsel.                                 09:35:23 |
|                                    Page 27 |                                    Page 29 |

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

| | |
|---|---|
| 1 Q. Let me be super clear. I'm not asking you 09:35:23<br>2   to tell me what counsel said. I am looking 09:35:26<br>3   for what Mr. Lee said. How would you 09:35:28<br>4   summarize what Mr. Lee told you about this 09:35:31<br>5   topic? 09:35:32<br>6 A. I think I summarized it already. It was 09:35:33<br>7   generalized pricing conversation. 09:35:36<br>8 Q. Did he give you any substantive information 09:35:37<br>9   about how Biogen or pharmaceutical companies 09:35:39<br>10   may respond by way of pricing in the 09:35:42<br>11   marketplace? 09:35:45<br>12     MS. WANG: Objection. 09:35:46<br>13 A. No, he did not. 09:35:46<br>14 Q. Did he give you any information about how 09:35:49<br>15   Biogen expects to respond to the entry of a 09:35:53<br>16   biosimilar? 09:35:57<br>17     MS. WANG: Objection. 09:35:59<br>18 A. He shared general information around pricing 09:36:01<br>19   and how pricing might work with a competitive 09:36:08<br>20   entrant. 09:36:11<br>21 Q. And what information was that? 09:36:12<br>22     MS. WANG: Objection. 09:36:14<br>23 A. I think I shared it with just general 09:36:14<br>24   information, just general theoretical 09:36:17<br>25   dynamics. 09:36:20<br>Page 30 | 1   what may happen in the case of a competitive 09:37:28<br>2   entrant. 09:37:32<br>3 Q. Okay. What was his perception of what may 09:37:32<br>4   happen in the case of a competitive entrant? 09:37:35<br>5 A. He shared some generalized understood kind 09:37:38<br>6   of -- I'm trying to think of the best terms 09:37:50<br>7   to describe it. He shared some kind of 09:37:52<br>8   professionally understood dynamics of what 09:37:55<br>9   happens when a new entrant comes into the 09:37:59<br>10   market. 09:38:05<br>11 Q. And how did he describe those? 09:38:06<br>12     MS. WANG: Objection. 09:38:07<br>13 A. He didn't necessarily describe it, per se. 09:38:09<br>14   He discussed kind of the idea of kind of 09:38:15<br>15   what impact that might have on a market, 09:38:22<br>16   what impact that may have on the new entrant 09:38:24<br>17   or the existing entrant, existing 09:38:27<br>18   participant. 09:38:30<br>19 Q. To the best that you can, can you tell me 09:38:30<br>20   the words that he spoke to you or a summary 09:38:32<br>21   of what he spoke to you about that topic. 09:38:35<br>22     MS. WANG: Objection. 09:38:37<br>23 A. I mean, I think I've answered it. I think 09:38:38<br>24   I've given -- I'm not sure what else. He 09:38:43<br>25   gave a general background. I mean, as I 09:38:48<br>Page 32 |
| 1 Q. So what did he say about the theoretical 09:36:21<br>2   dynamics? 09:36:26<br>3 A. He gave a general description of how a 09:36:27<br>4   company may respond to a competitive entrant. 09:36:32<br>5 Q. And did he give you any indication about 09:36:35<br>6   expected changes in prices, how they might 09:36:40<br>7   change, what the amounts would be, discounts 09:36:42<br>8   off WAC, any other information other than 09:36:46<br>9   did he -- did he just say "I'm giving you 09:36:48<br>10   general information, stop," and that was the 09:36:50<br>11   end of the 20-minute conversation? 09:36:52<br>12     MS. WANG: Objection, compound, 09:36:54<br>13   vague. 09:36:55<br>14 A. So I'm going to ask you to rephrase the 09:36:57<br>15   question. 09:36:59<br>16 Q. Sure. 09:36:59<br>17 A. It's kind of... 09:36:59<br>18 Q. What did Mr. Lee tell you substantively 09:37:00<br>19   about responses with respect to pricing to 09:37:05<br>20   the entry of a biosimilar? 09:37:10<br>21     MS. WANG: Objection. 09:37:12<br>22 A. It was not respective to a biosimilar. As 09:37:13<br>23   I noted, it was respective to any competitive 09:37:17<br>24   entrant. So this was kind of a theoretical 09:37:20<br>25   conversation and it was his perception of 09:37:23<br>Page 31 | 1   noted, it was a 30-minute call, so it was 09:38:50<br>2   not a long or significant conversation. It 09:38:54<br>3   was just some generalized understanding of 09:38:58<br>4   how someone in his position might look at a 09:39:02<br>5   market. 09:39:09<br>6 Q. And I'm just asking you, to the best you 09:39:10<br>7   can recall from yesterday, what were his 09:39:13<br>8   words as to how -- what the response might 09:39:15<br>9   be? 09:39:21<br>10     MS. WANG: Objection. 09:39:21<br>11 A. I mean, I'm not sure I can necessarily 09:39:22<br>12   represent his words. So he, as I noted, he 09:39:27<br>13   generally just described the entrants into 09:39:33<br>14   the market and what may or may not happen. 09:39:36<br>15 Q. And do you have any recollection of what 09:39:40<br>16   he said regarding timing, scope, nature of 09:39:42<br>17   discounts, rebates, changes in pricing? 09:39:46<br>18     MS. WANG: Objection, compound. 09:39:49<br>19 A. Yeah, I'm going to ask you to rephrase. 09:39:52<br>20 Q. Sure. Just on the topic of pricing, rebates, 09:39:53<br>21   discount or other response to a competitive 09:39:58<br>22   entrant, do you have any recollection of what 09:40:00<br>23   he said? 09:40:03<br>24 A. Sorry. Can you say it again? So it was 09:40:05<br>25   timing? 09:40:14<br>Page 33 |

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

**Page 34**

1    MR. OLSON:  Go ahead and read it    09:40:15
2    back, please.    09:40:16
3    (Question read)    09:40:17
4    A.  So it was -- so I do.    09:40:32
5    Q.  Okay.  What was it?    09:40:35
6    A.  It was talking theoretically around what a    09:40:37
7    company might do relative to an entrant    09:40:44
8    coming into the market and how they may    09:40:48
9    approach an entrant coming into the market.    09:40:51
10   Q.  Right.  And my question is not a summary of    09:40:53
11   it, but what do you recall him saying?    09:40:56
12   MS. WANG:  Objection.    09:40:58
13   Q.  Did he say, "I'm just talking about    09:40:59
14   theoretical," and he didn't give you any    09:41:01
15   numbers, didn't give you any indication of    09:41:03
16   size, didn't give you any indication of    09:41:04
17   timing?    09:41:06
18   MS. WANG:  Objection.    09:41:07
19   A.  So it was -- it was all theoretical.  It    09:41:08
20   was a conversation around pricing and kind    09:41:13
21   of, or a market dynamic of when a competitor    09:41:18
22   may enter the market.  So he -- there were    09:41:23
23   no specific numbers or timing discussed.    09:41:25
24   Q.  Did he give any indication about the nature,    09:41:28
25   scope or amount of any discounting or price    09:41:32

**Page 35**

1    changes?    09:41:35
2    MS. WANG:  Objection.    09:41:36
3    A.  Yes.    09:41:37
4    Q.  What did he say?    09:41:48
5    A.  [REDACTED]
     [REDACTED]
     [REDACTED]
     09:42:05
     [REDACTED]
     [REDACTED]
     [REDACTED]
     [REDACTED]
     [REDACTED]
     [REDACTED]
17   Q.  What was the theoretical construct?    09:42:29
18   MS. WANG:  Objection.    09:42:33
19   A.  I'm not sure I understand.    09:42:34
20   Q.  Sure.  Let me ask it this way.  Do you think    09:42:39
21   the theoretical construct was relevant to the    09:42:41
22   question of what would happen if a biosimilar    09:42:44
23   entered the market for natalizumab?    09:42:46
24   MS. WANG:  Objection.    09:42:49
25   A.  I'm sorry.  Do I think?    09:42:50

**Page 36**

1    Q.  Yes.    09:42:52
2    A.  I don't know.  It's hard for me to say what    09:42:54
3    I think.  You know, this is, it's -- we had,    09:42:56
4    as I said, we had a theoretical conversation    09:43:00
5    around a market entrant.    09:43:03
6    Q.  Did he give you any information that you    09:43:06
7    believe is relevant or useful in responding    09:43:10
8    to the topics that you've been designated on?    09:43:13
9    A.  Yes.    09:43:16
10   Q.  What did he tell you?    09:43:17
11   A.  He gave me a general background of how a    09:43:20
12   biotech company would deal with a market    09:43:27
13   entrant.    09:43:29
14   Q.  And what was the content of that general    09:43:30
15   background that you think is relevant or    09:43:32
16   useful in understanding the topics that    09:43:34
17   you've been designated on?    09:43:37
18   A.  He gave me a theoretical understanding of    09:43:39
19   how a pharmaceutical company may deal with    09:43:45
20   an entrant into the market.    09:43:49
21   Q.  You keep giving me the subject, but not the    09:43:50
22   content.  What is the content of, that he    09:43:53
23   gave you?    09:43:57
24   MS. WANG:  Objection.    09:43:57
25   A.  So he in kind of, I believe in consultation    09:43:59

**Page 37**

1    with counsel --    09:44:07
2    MS. WANG:  I'm going to stop for a    09:44:09
3    second because I don't want you to disclose    09:44:12
4    any discussions you had with counsel.    09:44:13
5    I might be able to help you out    09:44:15
6    here because I think the witness is just a    09:44:18
7    little bit confused on the subject between    09:44:19
8    privilege and not.  So if we can go off the    09:44:21
9    record for a second and have a conversation    09:44:24
10   with him about the privilege, and then I    09:44:26
11   think he can answer your question that you're    09:44:27
12   trying --    09:44:30
13   MR. OLSON:  I'll let you have your    09:44:31
14   break.    09:44:33
15   MS. WANG:  Thank you.  Can we go off    09:44:33
16   the record?    09:44:34
17   VIDEOGRAPHER:  The time is now 9:44    09:44:34
18   and we're off the record.    09:44:38
19   (Break taken)    09:44:39
20   VIDEOGRAPHER:  The time is now 9:47    09:47:27
21   and we are on the record.    09:47:43
22   BY MR. OLSON:    09:47:45
23   Q.  Following your discussion with counsel, what    09:47:46
24   testimony do you have that you believe you    09:47:49
25   can give me?    09:47:51

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL



Page 42

Page 43

18         MS. WANG:  Objection.       09:56:16
19

Page 44

17  Q.  Did you review any documents to help prepare   09:57:19
18     yourself to speak to the topics?        09:57:24
19  A.  Yes.                09:57:27
20  Q.  What documents?          09:57:28
21  A.  Documents related to the case.  I don't have   09:57:29
22     a list of the documents in front of me.      09:57:33
23  Q.  Do you have --           09:57:33
24  A.  If you were to put something in front of me,   09:57:36
25     I may be able to tell you if I reviewed it   09:57:38

Page 45

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL



```
 1     or not.                          09:57:41
 2   Q. Do you have a memory of any of them that    09:57:41
 3     you viewed as particularly important or     09:57:44
 4     useful?                          09:57:45
 5         MS. WANG:  Objection.         09:57:46
 6   A. Like I said, it's hard for me to say        09:57:48
 7     important, useful.  If you put a document    09:57:51
 8     in front of me, I can tell you whether or    09:57:54
 9     not I reviewed it or not.              09:57:56
10   Q. Okay.  There are a number of agreements     09:57:59
11     that are the subject of the notice.
```

Page 46

```
 4         MS. WANG:  Objection.        10:00:10
```

Page 48

```
18         MS. WANG:  Objection.         09:59:34
19
```

Page 47

Page 49

HIGHLY CONFIDENTIAL



```
22   Q.  Okay.  If you look to your right, you'll      10:03:36
23        see four patents marked as Exhibits 1001 to   10:03:43
24        1004, and my first question to you is whether  10:03:49
25        you have looked at those patents at any time?  10:03:53
```
Page 50

```
 1   A.  I have not.                                     10:03:57
 2   Q.  So including during your preparation, you       10:03:58
 3        did not review any of those patents?           10:04:02
 4   A.  I did not.                                       10:04:05
 5   Q.  Do you have any understanding as to whether     10:04:05
 6        or not those patents are what is being          10:04:09
 7        asserted against Sandoz in this matter?         10:04:12
 8   A.  Outside of what -- I mean, I'm not -- I'm not    10:04:16
 9        an attorney, so no, I do not.                   10:04:21
10   Q.  Okay.  Before 30 seconds ago, had you ever      10:04:23
11        heard of or referred to any of these four      10:04:40
12        patents?                                        10:04:45
13        MS. WANG:  Objection.                           10:04:46
14   A.  I mean, it's hard to really say, to be          10:04:48
15        honest.  You know, the numbers are thrown       10:04:58
16        out without really having the understanding     10:05:01
17        of what it means.  That's about the extent      10:05:03
18        of what I hear, so...  So I guess I've          10:05:06
19        probably heard the numbers before, but          10:05:10
20        nothing substantive beyond that.                10:05:11
21   Q.  In what context do you think you heard the      10:05:14
22        numbers before?                                 10:05:16
23        MS. WANG:  Objection.  I caution                10:05:17
24        you again not to reveal if the context is       10:05:18
25        only in discussions with counsel.  If it is     10:05:21
```
Page 51

```
 1        in discussions outside of communications        10:05:21
 2        with counsel, you can answer the question.      10:05:26
 3   A.  Any time I've heard a number, it's been in      10:05:26
 4        the presence of counsel.                        10:05:29
 5   Q.  All right.  In your business role, do you       10:05:30
 6        recall ever talking about any of these four    10:05:32
 7        patents?                                        10:05:34
 8   A.  No.                                              10:05:35
 9   Q.  Do you have any understanding of what the       10:05:35
10        inventions are of any of these four patents    10:05:44
11        other than what you've learned from counsel?    10:05:49
12   A.  On a...                                          10:05:52
13   Q.  Let me see if I can make it easier.  Without    10:05:58
14        disclosing to me the contents of what counsel   10:06:02
15        said, did you ever receive from counsel for     10:06:05
16        Biogen an explanation of what the inventions    10:06:10
17        are of these, just yes or no?                   10:06:14
18   A.  No.                                              10:06:18
19   Q.  It would then be accurate to say that you       10:06:18
20        don't know whether any of those four patents    10:06:30
21        are necessarily to the marketing or sale of     10:06:32
22        Tysabri, correct?                               10:06:36
23        MS. WANG:  Objection.  This is also             10:06:37
24        outside the scope of the testimony and the      10:06:39
25        topics that he's been prepared on for this      10:06:41
```
Page 52

```
 1        deposition.                                      10:06:45
 2   A.  Patents are outside my area of expertise.        10:06:45
 3   Q.  Right, but I'm just trying to find out          10:06:47
 4        whether you have any understanding on this      10:06:49
 5        topic.  Do you know in any way whether any      10:06:51
 6        of the four patents are necessary to the        10:06:54
 7        marketing or sale of Tysabri?                    10:06:56
 8        MS. WANG:  Objection, again, are                10:06:57
 9        you asking him as a 30(b)(6) witness or are     10:06:59
10        you asking him in his personal knowledge        10:07:02
11        here?                                            10:07:04
12        MR. OLSON:  I'm just asking the                  10:07:05
13        question.                                        10:07:07
14        MS. WANG:  Same objection.                       10:07:07
15   A.  I don't typically involve myself with patents   10:07:08
16        and how they are involved with our marketing    10:07:15
17        of a product.  I mean, other than what I've     10:07:18
18        already said, I'm not sure how I can expand      10:07:22
19        on that.                                         10:07:26
20   Q.  All right.  Do you have any knowledge or        10:07:26
21        understanding as to whether any of the four     10:07:27
22        patents are necessary to the marketing or       10:07:29
23        sale of a biosimilar?                            10:07:32
24        MS. WANG:  Objection, same                       10:07:33
25        objection.                                       10:07:35
```
Page 53

14 (Pages 50 - 53)

A. I don't work for a biosimilar company, so 10:07:36
I don't know. 10:07:41
Q. Do you know whether any of the four patents 10:07:41
are important to the manufacture of Tysabri? 10:07:44
MS. WANG: Objection. Again, 10:07:48
outside the scope of the topics for which 10:07:50
he's been designated as a witness for the 10:07:52
company. 10:07:54
A. So, again, I will just note in my role, I 10:07:55
don't deal with patents. 10:08:00
Q. I'm just asking for an answer to the 10:08:02
question. 10:08:04
A. I think I did answer. 10:08:05
Q. You told me what your role is. Do you have 10:08:06
any understanding, yes or no, as to whether 10:08:09
any of the four patents are important to the 10:08:12
manufacture of Tysabri? 10:08:15
MS. WANG: Objection. 10:08:16
A. I do not. 10:08:17
Q. Okay. That's all I'm looking for. 10:08:18
A. Gotcha. 10:08:21
Q. It's not difficult, not difficult. 10:08:22
Do you know whether or not any 10:08:23
of the four patents are important to the 10:08:26
manufacture of a biosimilar? 10:08:27

MS. WANG: Objection. 10:08:29
A. I do not. 10:08:31
Q. Okay. And do you know whether any of the 10:08:31
four patents are important to the marketing 10:08:35
or sale of Tysabri? 10:08:37
MS. WANG: Objection. 10:08:39
A. As I've noted previously, this isn't an 10:08:40
area where I have any degree of expertise, 10:08:42
so I honestly don't know. It's not an area 10:08:45
that I believe that I'm specifically meant 10:08:49
to have expertise on. 10:08:52
Q. Outside of what is known to counsel, does 10:08:53
Biogen have any information regarding whether 10:09:11
or not Sandoz is likely to infringe any of 10:09:17
the four patents that have been put in front 10:09:21
of you? 10:09:24
MS. WANG: Objection. 10:09:25
A. That is not an area where I would have any 10:09:26
expertise. 10:09:30
Q. So you don't know? 10:09:31
A. I do not know. 10:09:32
[redacted]

[redacted] :11:31

[redacted] 10:12:05
Q. Just confirm for me that the Stratify test 10:12:07
that we're talking about is the test that's 10:12:13
described in the exhibit that's next to you, 10:12:16
and I don't remember the number right off 10:12:18
the top of my head. Actually, I think it's 10:12:21
Exhibit 1007. 10:12:27
A. Yes, Stratify JCV Diagnostic Select or 10:12:28
DxSelect. I'm sorry. Stratify JCV DxSelect. 10:12:42
Q. And that's supposed to mean diagnostic select 10:12:43
or that's what that's referring to? 10:12:46
A. I'm not sure if it means diagnostic or not -- 10:12:48
Q. Okay. 10:12:50
A. -- but it is a prognostic test. 10:12:51
[redacted]

HIGHLY CONFIDENTIAL



Page 58:

```
 8          MS. WANG:  Objection.            10:13:45
```

```
18          Would it be okay if we took a break?   10:14:33
19   Q.  Oh, of course, absolutely.  You should tell   10:14:35
20   me that at any time.                    10:14:38
21   A.  Thank you.  I appreciate that.       10:14:38
22          VIDEOGRAPHER:  The time is 10:14 and   10:14:40
23   we are off the record.                  10:14:42
24          (Break taken)                    10:14:43
25                  10:15:02
```

Page 59:

```
 1          (Exhibits 1045, 1046 and 1047 marked   10:17:29
 2   for identification.)                    10:17:30
 3          VIDEOGRAPHER:  The time is now 10:25   10:21:29
 4   and we are on the record.               10:25:33
 5   BY MR. OLSON:                           10:25:35
```

Page 60:

Page 61:

```
 9          MS. WANG:  Objection.            10:28:50
```

```
17          MS. WANG:  Objection.            10:29:08
```

```
23          MS. WANG:  Objection.  To the extent   10:29:33
24   that you have information from counsel on   10:29:34
25   the subject, do not disclose that, but other   10:29:38
```

16 (Pages 58 - 61)



HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL



Page 70

Page 71

Page 72

10          MS. WANG:  Objection.          10:43:18

19          MS. WANG:  Objection.          10:43:41

2          MS. WANG:  Objection.          10:46:00

Page 73

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL



12        MS. WANG:  Objection.        10:48:51

Page 74

Page 75

Page 76

Page 77

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 78

15        MS. WANG:  Objection.                10:58:34

Page 80

3        MS. WANG:  Objection, calls for        10:56:29
4    legal conclusion.                          10:56:30

9        MS. WANG:  Objection.                10:56:49

24        MS. WANG:  Objection, same objection  10:57:42
25    as before.                               10:57:43

Page 79

11        MS. WANG:  Same objection as to        10:59:31
12    legal interpretation.                    10:59:33

22        MS. WANG:  Objection to the extent    11:00:24
23    if the source is counsel, you should not  11:00:26
24    disclose the communications or substance of  11:00:28
25    any communications with counsel.  If it is  11:00:30

Page 81

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL



Page 82

```
1   not, if it's an independent source, you can    11:00:32
2   answer the question.                           11:00:34
```

Page 84

Page 83

```
5   MS. WANG:  Objection, asked and     11:02:31
6   answered.                           11:02:32
```

Page 85

```
1   MS. WANG:  Objection, to the extent    11:05:59
2   again no discussion of substantive          11:06:00
3   communications with counsel, but you can    11:06:02
4   answer separate from that.                  11:06:05
```

```
15   MS. WANG:  Objection, same     11:06:59
16   objection.                     11:07:01
```

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL



2          MS. WANG:  Objection.  Again, you        11:08:12
3     can testify to things that are outside of      11:08:15
4     substantive communications you've had with      11:08:17
5     counsel.                                        11:08:18

13          MS. WANG:  Objection.              11:08:55

24          MS. WANG:  Objection.              11:09:33

Page 86

9          MS. WANG:  Objection.              11:10:14

Page 87

7          MS. WANG:  Objection.              11:12:55

Page 88

Page 89

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL



1       MS. WANG: Objection.     11:14:02

8       MS. WANG: Objection.     11:14:27

17      MS. WANG: Objection.     11:14:53

Page 90

9       MS. WANG: Objection.     11:17:05

18      MS. WANG: Objection.     11:17:37

Page 92

3       MS. WANG: Objection.     11:15:27

Page 91

4       MS. WANG: Objection.     11:18:18

13      MS. WANG: Objection.     11:18:43

Page 93

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL



7        MS. WANG:  Objection.              11:19:49

16       MS. WANG:  Objection.              11:20:27

20

8        MS. WANG:  Objection.              11:23:39

Page 94

Page 95

Page 96

Page 97

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



5       MR. OLSON:  I'm going to mark as     11:31:48
6   the next exhibit in order

14       MS. DOLPHIN:  I apologize.  Can we     11:32:14
15   go off the record really quickly?          11:32:32
16       MR. OLSON:  Okay.              11:32:32
17       VIDEOGRAPHER:  The time is now 11:32   11:32:32
18   and we are off the record.          11:32:34
19       (Break taken)              11:32:35
20       VIDEOGRAPHER:  The time is now 11:33   11:33:18
21   and we are now on the record.          11:33:20
22   BY MR. OLSON:              11:33:21
23   Q.  All right.  And I just made a representation,   11:33:21
24   but I'm hoping to be quick.  If it turns out   11:33:25
25   I'm not quick, then you just tell me and     11:33:27

Page 102

1   we'll take a break.              11:33:29
2   A.  Understood.              11:33:31
3

19       MS. WANG:  Objection.          11:34:24

Page 103

9       MS. WANG:  Objection.          11:35:06

Page 104

7       MR. OLSON:  I'm going to mark as     11:36:17
8   another exhibit,

13

Page 105

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL



Page 106

Page 108

Page 107

Page 109

Veritext Legal Solutions
866 299-5127



HIGHLY CONFIDENTIAL

Page 110

1

Page 112

9          MS. WANG:  Objection.          11:44:49

21          VIDEOGRAPHER:  The time is now 11:45   11:45:25
22   and we are off the record.          11:45:28
23          (Break taken)          11:45:29
24          VIDEOGRAPHER:  The time is now 11:58   11:58:32
25   and we are on the record.          11:58:34

Page 111

Page 113

HIGHLY CONFIDENTIAL



16          MS. WANG:  Objection to the extent          12:04:24

17     you're getting substantive communications          12:04:25

18     from counsel.

Page 114

17          MS. WANG:  Objection, vague.          12:06:16

25          MS. WANG:  Objection.  1048 is          12:06:52

Page 115

Page 116

Page 117

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL



Veritext Legal Solutions
866 299-5127

[redacted]
MS. WANG: Objection. 12:15:42
[redacted] 12:16:14
[redacted]

Page 122

MS. WANG: Objection. 12:16:26
[redacted]
MS. WANG: Objection. 12:16:34
[redacted]
MS. WANG: Objection. 12:16:45
[redacted]
MS. WANG: Objection. 12:16:54
[redacted]

Page 123

[redacted]
MS. WANG: Objection, outside the 12:17:25
scope. 12:17:26
[redacted]
MS. WANG: Objection, outside the 12:18:13
scope. 12:18:14

Page 124

[redacted]
MS. WANG: Objection, outside the 12:18:21
scope. 12:18:23
[redacted]
MS. WANG: Objection, misstates his 12:18:38
testimony. 12:18:39
[redacted]
MS. WANG: Objection. 12:18:50
[redacted]
MS. WANG: Objection. 12:19:19

Page 125



HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL



Page 134

3    MS. WANG:  Objection.    12:33:31

9    MS. WANG:  Objection.    12:33:50

23    MS. WANG:  Objection.    12:34:47

Page 135

6    MS. WANG:  Objection.    12:35:20

8    MR. OLSON:  Why don't we take our    12:35:30
9    lunch break.    12:35:31
10    MS. WANG:  Okay.    12:35:32
11    VIDEOGRAPHER:  The time is now 12:35    12:35:34
12    and we are off the record.    12:35:36
13    (Lunch break)    12:35:39
14    12:35:39
15    12:35:39
16
17
18
19
20
21
22
23
24
25

Page 136

1    AFTERNOON SESSION    01:21:33
2    VIDEOGRAPHER:  The time is now 1:22    01:21:41
3    and we are on the record.    01:22:42
4    BY MR. OLSON:    01:22:43
5  Q.  During the lunch break or in connection    01:22:44
6    with any other break in connection with your    01:22:47
7    deposition, have you discussed either the    01:22:49
8    substance of your testimony or any of the    01:22:51
9    topics with counsel?    01:22:53
10  A.  No.    01:22:55

Page 137

23    MS. WANG:  Objection.    01:24:58

35 (Pages 134 - 137)

Veritext Legal Solutions
866 299-5127



21          MS. WANG:  Objection.          01:26:01

Page 138

14          MS. WANG:  Objection.          01:26:39

23          MS. WANG:  Objection.          01:27:00

Page 139

8          MS. WANG:  Objection.          01:27:33

Page 140

24          MS. WANG:  Objection.          01:30:21

Page 141

36 (Pages 138 - 141)



HIGHLY CONFIDENTIAL

23          MS. WANG:  Objection.          01:31:40

Page 142

8

Page 144

8          MS. WANG:  Objection.          01:34:54

Page 143

Page 145

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL



Veritext Legal Solutions
866 299-5127



HIGHLY CONFIDENTIAL





4    MS. WANG: Objection.    01:55:20

Page 158

Page 160

Page 159

Page 161

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL



14          MS. WANG:  Objection.          01:58:36

17          MS. WANG:  Objection.          02:00:47

15          MS. WANG:  Objection.          02:02:00

Page 162

Page 164

Page 163

Page 165

42 (Pages 162 - 165)



Page 166

Page 168

Page 167

Page 169

HIGHLY CONFIDENTIAL



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



3       MS. WANG:  Objection.        02:14:49

10      MS. WANG:  Objection.        02:15:02

23      MS. WANG:  Objection.        02:15:35

Page 174

14      MS. WANG:  Objection.        02:16:41

Page 175

13      MS. WANG:  Objection.        02:18:33

22      MS. WANG:  Objection.        02:18:54

Page 176

Page 177

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 178

Page 179

Page 180

Page 181

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 182

Page 184

Page 183

Page 185

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 186

Page 188

Page 187

Page 189

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 190

Page 191

Page 192

Page 193

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL



Page 194

Page 195

Page 196

Page 197

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 198

Page 199

Page 200

Page 201

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 202

Page 204

Page 203

Page 205

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 206

Page 207

Page 208

Page 209

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 210

Page 212

Page 211

Page 213

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 214

Page 216

Page 215

Page 217

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 218

Page 220

Page 219

Page 221

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



8      MS. WANG:  Objection.      03:34:49

Page 222

Page 223

Page 224

Page 225

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 226

Page 227

Page 228

Page 229

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 234

Page 235

Page 236

Page 237

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 238

Page 239

Page 240

Page 241

HIGHLY CONFIDENTIAL



Page 242

Page 243

Page 244

Page 245

HIGHLY CONFIDENTIAL



Page 246

Page 247

Page 248

Page 249

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 250

Page 251

Page 252

Page 253

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL



Page 254

Page 255

Page 256

Page 257

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 258

Page 259

Page 260

Page 261

HIGHLY CONFIDENTIAL



Veritext Legal Solutions
866 299-5127



Page 266

Page 267

Page 268

Page 269

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 270

Page 271

Page 272

Page 273

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 274

Page 275

Page 276

Page 277

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 278

Page 279

Page 280

Page 281

HIGHLY CONFIDENTIAL



Page 282

Page 284

Page 283

Page 285

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL



Page 286

Page 288

Page 287

Page 289

Veritext Legal Solutions
866 299-5127





HIGHLY CONFIDENTIAL

Page 294

Page 295

Page 296

Page 297

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Page 298

Page 300

Page 299

Page 301

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL

1    COMMONWEALTH OF MASSACHUSETTS)
2    SUFFOLK, SS  )
3
4
5         I, Jeanette Maracas, Registered
     Professional Reporter and Notary Public in
     and for the Commonwealth of Massachusetts, do
6    hereby certify that there came before me on
     the 6th day of January, 2023, at 9:03 a m ,
7    the person hereinbefore named, who was by me
     duly sworn to testify to the truth and
8    nothing but the truth of his knowledge
     touching and concerning the matters in
9    controversy in this cause; that he was
     thereupon examined upon his oath, and his
10   examination reduced to typewriting under my
     direction; and that the deposition is a true
11   record of the testimony given by the witness
12
13        I further certify that I am neither
     attorney or counsel for, nor related to or
     employed by, any attorney or counsel employed
14   by the parties hereto or financially
     interested in the action
15
16        In witness whereof, I have hereunto
     set my hand this 13th day of January, 2023
17
18
19
20
21
22
23        <%21498,Signature%>
          Notary Public
24        My commission expires 7/29/27
25
                                        Page 306

1 _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2    Transcript - The witness should review the transcript and
3    make any necessary corrections on the errata pages included
4    below, notating the page and line number of the corrections.
5    The witness should then sign and date the errata and penalty
6    of perjury pages and return the completed pages to all
7    appearing counsel within the period of time determined at
8    the deposition or provided by the Federal Rules.
9 __ Federal R&S Not Requested - Reading & Signature was not
10   requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page 308

1 Sophie F. Wang, Esq.
2 Swang@choate.com
3                    JANUARY 13, 2023
4 RE: BIOGEN INC V. SANDOZ INC
5 JANUARY 6, 2023, DANIEL O'CONNELL, JOB NO. 5641566
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10   to schedule a time to review the original transcript at
11   a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13   Transcript - The witness should review the transcript and
14   make any necessary corrections on the errata pages included
15   below, notating the page and line number of the corrections.
16   The witness should then sign and date the errata and penalty
17   of perjury pages and return the completed pages to all
18   appearing counsel within the period of time determined at
19   the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21   Counsel - Original transcript to be released for signature
22   as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24   time of the deposition.
25
                                        Page 307

1 BIOGEN INC V. SANDOZ INC
2 DANIEL O'CONNELL (#5641566)
3        E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22 _____
23 _____  _____
24 WITNESS                    Date
25
                                        Page 309

78 (Pages 306 - 309)

**[& - 1053]**



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

**[2013 - 2817]**



Page 3

**[284 - 9:47]**



Page 4

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

**[addendum - agreement]**



Page 6

**[agreements - apologize]**



Page 7

HIGHLY CONFIDENTIAL

**[apologize - assigned]**



Page 8

HIGHLY CONFIDENTIAL

**[assignment - back]**



Page 9

HIGHLY CONFIDENTIAL

**[back - believe]**



Page 10

**[believe - biogen]**



Page 11

HIGHLY CONFIDENTIAL

**[biogen – bottom]**



Page 12

**[bought - case]**



Page 13

HIGHLY CONFIDENTIAL

**[case - cirion]**



Page 14

HIGHLY CONFIDENTIAL



15

HIGHLY CONFIDENTIAL

**[committee - confer]**



Page 16

HIGHLY CONFIDENTIAL

**[conferred - convention]**



Page 17

HIGHLY CONFIDENTIAL

**[conversation - counsel]**



Page 18

HIGHLY CONFIDENTIAL

**[counsel - december]**



Page 19

**[december - determination]**



Page 20

**[determinations - discontinuations]**



Page 21

HIGHLY CONFIDENTIAL

**[discontinuations - documents]**



Page 22

HIGHLY CONFIDENTIAL

**[doing - employed]**



Page 23

**[employee - examines]**



Page 24

HIGHLY CONFIDENTIAL

**[example - expected]**



Page 25

HIGHLY CONFIDENTIAL

**[expected - fdi]**



Page 26

HIGHLY CONFIDENTIAL



e 27

**[follow – further]**



Page 28

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

**[going - happen]**



Page 30

**[happen - honestly]**



Page 31

HIGHLY CONFIDENTIAL

**[honestly - incorrect]**



Page 32

**[increase - intentionally]**



Page 33

**[interacting - jobs]**



Page 34

**[join - know]**



Page 35

**[know - lay]**

| | | | |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |

HIGHLY CONFIDENTIAL

**[ldt - lines]**



Page 37

HIGHLY CONFIDENTIAL

**[lipitor - made]**



Page 38

**[mail - market]**



Page 39

**[market – meant]**



HIGHLY CONFIDENTIAL

**[measure - morrison]**



Page 41

**[move - neurotiers]**



Page 42

**[never - objection]**



Page 43

**[objection - objections]**



Page 44

HIGHLY CONFIDENTIAL

**[obligation - olson]**



Page 45

HIGHLY CONFIDENTIAL

**[once - page]**



Page 46

**[page - patents]**



130:25 232:7

Page 47

**[patents - perjury]**



Page 48

HIGHLY CONFIDENTIAL

**[permitted - position]**



Page 49

HIGHLY CONFIDENTIAL

**[positions - previously]**



Page 50

HIGHLY CONFIDENTIAL

**[previously - product]**



Page 51

**[product - provisions]**



Page 52

**[public - quest]**



Page 53

**[quest - reason]**



Page 54

HIGHLY CONFIDENTIAL

**[reason - reflected]**



Page 55

**[reflected - relevant]**



Page 56

HIGHLY CONFIDENTIAL

**[relevant - respect]**



Page 57

HIGHLY CONFIDENTIAL

**[respect - right]**



Page 58

**[right - sales]**



Page 59

HIGHLY CONFIDENTIAL

**[sales - see]**



Page 60

HIGHLY CONFIDENTIAL

**[see - services]**



Page 61

**[services - slides]**



Page 62

**[slightly - spreadsheet]**



Page 63

HIGHLY CONFIDENTIAL

**[spreadsheet - stratify]**



Page 64

**[stratify - surveys]**



Page 65

HIGHLY CONFIDENTIAL



**[tell - theresa]**



15

Page 67

HIGHLY CONFIDENTIAL

**[thing - time]**



Page 68

**[time - transaction]**



Page 69

**[transactions - tysabri]**



Page 70

**[tysabri - ultimately]**



Page 71

**[umbrella - university]**



Page 72

**[untold - videographer]**



Page 73

**[videotaped - wang]**



Page 74

HIGHLY CONFIDENTIAL



ge 75

**[wholesale - yesterday]**



Page 76

HIGHLY CONFIDENTIAL



77

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

BIOGEN INC. and BIOGEN MA INC.,

        *Plaintiffs,*

   v.

SANDOZ INC. and POLPHARMA
BIOLOGICS S.A.,

        *Defendants.*

C.A. No. 22-1190-GBW

**CONFIDENTIAL**

---

**SANDOZ INC.'S NOTICE OF DEPOSITION OF**
**BIOGEN INC. AND BIOGEN MA INC. PURSUANT TO FED. R. CIV. P. 30(B)(6)**

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30(b)(6) and the Joint

Stipulation and Scheduling Order for Expedited Preliminary Injunction Proceedings (D.I. 20),

Defendant Sandoz Inc. ("Sandoz") will take the deposition upon oral examination of Biogen Inc.

and Biogen MA Inc. (collectively, "Biogen") through its designated agent(s).  The deposition

will take place at Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King

Street, Wilmington, DE 19801.

This deposition will be taken before an officer authorized to administer oaths and take

testimony, and the deposition may be recorded by any means that the Federal Rules of Civil

Procedure permit, including audio, video, and stenographic means, as well as means for the

instant display of testimony on a computer. The deposition will continue from day to day until

completed.

It is hereby requested that prompt notification in writing be given to the undersigned as to

the name, address, telephone number, capacity and job title of each person so designated to

testify and matters on which the person will testify.

Pursuant to the provisions of Rule 30(b)(6) of the Federal Rules of Civil Procedure, Biogen is directed to and reminded of its obligation to confer with Sandoz and to designate one or more persons who consent to testify on Biogen's behalf concerning the topics identified in Attachment A about information known or reasonably available to Biogen available to Biogen.

Dated: November 22, 2022

Of Counsel:

Erik J. Olson
Eric C. Pai
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com
epai@mofo.com

Matthew Chivvis
Rachel S. Dolphin
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
mchivvis@mofo.com
rdolphin@mofo.com

Wesley WL Chen
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, CA 92130
(858) 720-5100
wchen@mofo.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Samantha G. Wilson*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendant/Counterclaimant
Sandoz Inc.*

**ATTACHMENT A**

**DEFINITIONS**

1.      "Biogen," means Plaintiff Biogen Inc., Plaintiff Biogen MA, Inc., and any of their officers, directors, employees, corporate parents, subsidiaries, affiliates, agents, consultants, independent contractors, experts, investigators, representatives, predecessors-in-interests, or successors-in-interest.

2.      "Sandoz" means Defendant Sandoz Inc., and its officers, directors, and employees.

3.      "Complaint" means the September 9, 2022 Complaint in this Litigation, including all amendments to that Complaint.

4.      "Include" and "including" are illustrative and are in no way a limitation of the information required and shall be deemed to be followed by the phrase "without limitation."

5.      "FDA" means the United States Food and Drug Administration.

6.      "JCV" means John Cunningham virus.

7.      "PML" means progressive multifocal leukoencephalopathy.

8.      "Concerning," "relating to," "referring to," and "regarding" mean in whole or in any part alluding to, responding to, concerning, relating to, connected with, involving, commenting on, in respect of, about, associated with, discussing, evidencing, showing, describing, reflecting, analyzing, summarizing, memorializing, consisting of, constituting, identifying, stating, tending to support, tending to discredit, referring to, or in any way touching upon.

9.      "Litigation" means the above-captioned case.

10.    "Patents-in-Suit" means the patents asserted in this Litigation, including United States Patent Nos. 7,157,276; 7,759,117; 8,124,350; 8,318,416; 8,809,049; 8,871,449; 9,005,926; 9,096,879; 9,109,015; 9,212,379; 9,316,641; 9,493,567; 9,562,252; 9,696,307; 9,709,575; 9,790,533; 10,119,976; 10,233,245; 10,308,706; 10,444,234, 10,590,454; 10,677,803; 10,705,095; 10,844,416; 11,268,119; 11,280,794; 11,287,423; and 11,292,845.

11.    "PI Patents" means the patents identified in Plaintiffs' Notice of Initial Selection of Patent Claims and Preliminary Infringement Contentions for Expedited Preliminary Injunction Proceedings, including United States Patent Nos. 9,096,879; 10,844,416; 9,316,641; 10,119,976; and 11,280,794.

12.    "Natalizumab" means the humanized monoclonal antibody against the alpha-4 integrin.

13.    "Stratify" means any and all versions of the Stratify JCV antibody assay, including the Stratify™ JCV Antibody Enzyme-Linked Immunosorbent Assay ("ELISA") Test.

14.    "Elan" means Elan Corporation, plc, including its officers, directors, employees, corporate parents, subsidiaries, affiliates, agents, consultants, independent contractors, representatives, predecessors-in-interests, or successors-in-interest.

15.    "BLA" and its plural form means Biologic License Application.

## TOPICS

1.    Licenses, contracts, and agreements concerning any of the Patents-in-Suit, and the negotiations leading to the formation of those licenses, contracts, and agreements, including Biogen's contractual and license relationship with Quest Diagnostics, Diasorin Molecular, and/or Focus Diagnostics with respect to the performance of the Stratify assay and Biogen's contractual

and license relationship with laboratories that conduct or have conducted JCV testing, such as licenses, contracts, agreements, and covenants not to sue regarding the use of Stratify.

2.      The rates and terms on which Biogen has licensed out or licensed in any manufacturing technologies for any biological product, any medical diagnostic patents, or any method of treatment patents involving a medical diagnostic.

3.      Any and all efforts taken by Biogen to enforce any license, commercial or medical limitation on the use of the Stratify assay.

4.      Guidance, instructions, and materials prepared for or provided to physicians, patients, or health care providers concerning Tysabri, including the REMS program for Tysabri, instructions regarding anti-JCV antibody testing, and instructions or encouragement to use JCV index values to classify or assess risk in patients.

5.      Any plans by Biogen to revise or change its REMS program, the use of Stratify or other anti-JCV antibody testing, or instructions regarding the use of JCV index values to classify or assess risk in patients if a proposed biosimilar natalizumab product launches.

6.      Guidance, instructions, and trainings prepared for or provided to Biogen sales or field representatives engaged in promoting or marketing Tysabri or Stratify.

7.      Guidance, instructions, and materials that instruct physicians whether or how to administer Tysabri if a patient tests positive for JCV antibodies.

8.      Guidance, instructions, and materials that Biogen has prepared for or provided to physicians, patients, or health care providers in the United States concerning the use of a JCV index value of 0.9, 1.2, or 1.5 for evaluating the risk of PML.

9.      Any information that Biogen has (other than what was obtained from Sandoz in discovery) regarding how Sandoz will handle anti-JCV antibody testing in connection with the marketing of a biosimilar natalizumab product.

10.     How and in what manner Biogen or any of its licensees practice any of the Patents-in-Suit, including how and in what manner Biogen practices or instructs or encourages the practice of the asserted claims of U.S. Patent Nos. 10,119,976 and 11,280,794 and how often and in what circumstances the claims of the U.S. Patent No. 9,316,641 are practiced in connection with patient blood samples taken to run the Stratify assay.

11.     How and in what manner Biogen practices claims 5, 9, and 13 of U.S. Patent No. 9,096,879 and claim 4 of U.S. Patent No. 10,844,416, including whether batches before 2010 were made using the methods of the asserted claims of the '879 and '416 patents; if so, the dates on which each such batch made using the asserted claims of the '879 and '416 patents was made, and if not, the date on which such batches were made and why the claimed methods were not necessary to make such batches.

12.     Biogen's awareness of any instances, including any of Biogen's manufacturing processes, protocols, standard operating procedures, or publications, in which a mammalian cell culture is or was supplemented with a feed medium comprising asparagine, glutamine, or a metabolic precursor thereof, in an amount sufficient to reduce serine misincorporation, and all evidence that the amount of asparagine or metabolic precursor is or was sufficient to reduce serine misincorporation.

13.     When and how Biogen first began instructing or encouraging physicians to use an index value below 0.9 with respect to an anti-JCV antibody assay in connection with treatment with natalizumab in the United States.

14.     Biogen's best scientific understanding of the term "at or below an index value of 0.9" as used in the asserted claims of U.S. Patent Nos. 10,119,976 and 11,280,794.

15.     Pricing, costs, gross revenue, net revenue, profits, and market share (compared to other competing products) associated with Tysabri from 2004 to present.

16.     Sales projections, forecasts, market share projections, pricing forecasts, and other economic studies relating to Tysabri, any biosimilar natalizumab product, any biosimilar entry to the natalizumab market, or natalizumab, including any valuation or licenses of the PI Patents, such as studies, analyses, reports or other communications concerning the value, estimated value or projected value of the PI Patents and any internal financial or market modeling that identifies when a biosimilar natalizumab product will enter the market.

17.     Whether and why Biogen believes it will suffer irreparable harm, including how the alleged infringement of any patent is causally connected to any irreparable harm that Biogen believes will occur if Sandoz is permitted to sell its biosimilar natalizumab product.

18.     Any price erosion, loss of customers, loss of market share, and/or other harm allegedly caused by any alleged infringement of the PI Patents.

19.     Biogen's collaboration with Elan relating to the development of natalizumab, including any due diligence, market analyses or forecasts, and Biogen's subsequent purchase of Elan's interest in Tysabri, including the purchase price, due diligence, and market analyses or forecasts related to the purchase.

20.     The conception and reduction to practice of the inventions described and claimed in the PI Patents, including the identity and content of any documents that reflect either conception or reduction to practice for the asserted claims.

21.     The facts and circumstances surrounding Biogen's development of Stratify, including the agents, antigens, and substrates used in Stratify.

22.     The facts and circumstances known to Biogen regarding how often the confirmatory assay is run on patient samples in connection with the performance of the Stratify assay.

23.     The facts and circumstances surrounding Biogen's pricing, costs, gross revenue, net revenue, profits, and billing or invoicing associated with the Stratify test.

24.     The facts and circumstances relating to the use of Stratify by people that have not received and do not receive treatment with natalizumab.

25.     Current and former labels and package inserts for Tysabri, including all changes between each version of the labels and package inserts.

26.     Communications with the FDA or NIH concerning JCV testing, PML, Stratify, and the REMS for natalizumab.

27.     The development, testing, pilot, scale-up, manufacture, formulation, quality assurance, and quality control of Tysabri.

28.     The manufacturing process for each product known to Biogen that has been made using a process, method, or technology claimed in any of the PI Patents.

29.     All alternative methods for making natalizumab that do not use any process, method, or technology claimed in any of the PI Patents.

30.     Biogen's understanding, if any, regarding the meaning of each document cited as a basis for Biogen's contentions that Sandoz has infringed or will infringe the PI Patents.

31.     The organizational structure of Biogen, including the name and position (or title) of Biogen's current officers, directors, and managing agents, as well as individuals involved in

overseeing, managing, marketing, conducting financial or competitive or market analysis for, developing, making, or selling Tysabri or Stratify in the United States.

32.     Biogen's search for, collection, and production of documents and things in this case, and the authenticity of such documents and things.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 22, 2022, a copy of the foregoing

document was served on the persons listed below in the manner indicated:

**BY EMAIL**

Jack Blumenfeld
Karen Jacobs
Derek J. Fahnestock
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
kjacobs@morrisnichols.com
dfahnestock@morrisnichols.com

Eric J. Marandett
Anita M.C. Spieth
Greta A. Fails
Jennie D. Wilusz
Max A. Jacobs
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
emarandett@choate.com
aspieth@choate.com
gfails@choate.com
jwilusz@choate.com
mjacobs@choate.com

biogentysabri@choate.com


YOUNG CONAWAY STARGATT
& TAYLOR, LLP


*/s/ Samantha G. Wilson*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendant/Counterclaimant
Sandoz Inc.*

# EXHIBIT 11

Highly Confidential

Highly Confidential



Redacted – Non-Responsive

Highly Confidential

BIOG-TYS0002793658

Highly Confidential

BIOG-TYS0002793659



Highly Confidential

BIOG-TYS0002793660

Highly Confidential

BIOG-TYS0002793661



Highly Confidential

Highly Confidential

BIOG-TYS0002793663

Highly Confidential

BIOG-TYS0002793664

Highly Confidential

BIOG-TYS0002793665

BIOG-TYS0002793666

Highly Confidential

BIOG-TYS0002793667

Highly Confidential

BIOG-TYS0002793668

BIOG-TYS0002793669

Highly Confidential

BIOG-TYS0002793670

Highly Confidential

BIOG-TYS0002793671

Highly Confidential

BIOG-TYS0002793672

Highly Confidential

BIOG-TYS0002793673

Highly Confidential

BIOG-TYS0002793674

BIOG-TYS0002793675



BIOG-TYS0002793676

Highly Confidential

BIOG-TYS0002793677



Highly Confidential

Highly Confidential

BIOG-TYS0002793679

Highly Confidential

BIOG-TYS0002793680

Highly Confidential

BIOG-TYS0002793681

Highly Confidential



Highly Confidential

BIOG-TYS0002793683

Highly Confidential

BIOG-TYS0002793684

Highly Confidential



Highly Confidential

BIOG-TYS0002793686

**Redacted – Non-Responsive**

Highly Confidential

BIOG-TYS0002793687

Highly Confidential

BIOG-TYS0002793688



BIOG-TYS0002793689

Highly Confidential

BIOG-TYS0002793690

Highly Confidential

BIOG-TYS0002793691



Highly Confidential



BIOG-TYS0002793693

Highly Confidential

BIOG-TYS0002793694

Highly Confidential

BIOG-TYS0002793695



Highly Confidential

BIOG-TYS0002793696

Highly Confidential

BIOG-TYS0002793697

Highly Confidential

BIOG-TYS0002793698



Highly Confidential

BIOG-TYS0002793699

Highly Confidential

BIOG-TYS0002793700



Highly Confidential

Highly Confidential

BIOG-TYS0002793702

Highly Confidential

BIOG-TYS0002793703



Highly Confidential

BIOG-TYS0002793704

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 23, 2023, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**<u>BY EMAIL</u>**

Jack Blumenfeld
Karen Jacobs
Derek J. Fahnestock
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
kjacobs@morrisnichols.com
dfahnestock@morrisnichols.com

Eric J. Marandett
Anita M.C. Spieth
Jennie D. Wilusz
Max A. Jacobs
Sophie F. Wang
Marina Pullerits
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
emarandett@choate.com
aspieth@choate.com
jwilusz@choate.com
mjacobs@choate.com
swang@choate.com
mpullerits@choate.com

biogentysabri@choate.com


YOUNG CONAWAY STARGATT
& TAYLOR, LLP


*/s/ Samantha G. Wilson*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Sandoz Inc.*